```
                  UNITED STATES DISTRICT COURT

                          FOR THE

                 WESTERN DISTRICT OF VIRGINIA

                      ROANOKE DIVISION


* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,   * CRIMINAL NO. 7:12-CR-00032
                            * APRIL 15, 2013  9:45 A.M.
            Plaintiff,      * JURY TRIAL
                            * VOLUME I OF V
vs.                         *
                            * Before:
OSAMA MAHMUD MUSTAFA,       * HONORABLE SAMUEL G. WILSON
                            * UNITED STATES DISTRICT JUDGE
            Defendant.      * WESTERN DISTRICT OF VIRGINIA
* * * * * * * * * * * * * * * AND A JURY

APPEARANCES:

For the Plaintiff:      JOSEPH W.H. MOTT, ESQUIRE
                        TRISTAN DE VEGA
                        United States Attorney's Office
                        P.O. Box 1709
                        Roanoke, VA 24008


For the Defendant:      ANTHONY ANDERSON, ESQUIRE
                        MELISSA WINDHAM FRIEDMAN, ESQUIRE
                        P.O. Box 1525
                        Roanoke, VA 24007




Court Reporter:         Judy K. Webb, RPR
                        P.O. Box 1234
                        Roanoke, Virginia 24006
                        (540)857-5100 Ext. 5333


        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

U.S.A. v. Mustafa – 4/15/2013

```
 1                     I N D E X

 2   Defense Motion                                    6

 3   Ruling                                           10

 4   Preliminary Jury Instructions                    12

 5

 6   OPENING STATEMENTS:

 7   By Mr. Mott                                      17

 8   By Mr. Anderson                                  48

 9                                                Further
10                     Direct  Cross  Redirect  Recross  Redirect

11   WITNESSES FOR THE
       GOVERNMENT:
12   Timothy Mathers        59

13   Chris Gillenwater      64     100     110

14

15

16   GOVERNMENT
     EXHIBITS:                        MARKED        RECEIVED
17   1                                  97            97

18   2                                  98

19   3                                  48            58

20   4                                  48            61

21   5                                  83            85

22

23   DEFENDANT'S
     EXHIBITS:                        MARKED        RECEIVED
24   1                                 103           104

25
```

 1          (Court convened at 9:45 a.m.)

 2               THE COURT:  Good morning.

 3               Please call the case.

 4               THE CLERK:  *United States of America v. Osama Mahmud*

 5  *Mustafa*, Criminal Docket Number 7:12-CR-32.

 6               THE COURT:  Is the government ready to proceed?

 7               MR. MOTT:  It is, Your Honor.

 8               THE COURT:  Is Mr. Mustafa ready to proceed?

 9               MR. ANDERSON:  Your Honor, he is ready to proceed.

10  We have witnesses that are subpoenaed that are not here today

11  due to scheduling issues for Wednesday and Thursday.  Subject

12  to that, we are ready to proceed.

13               THE COURT:  All right.  Then you may begin.

14          (Jury voir dire was conducted but not transcribed at this

15  time.)

16               THE CLERK:  Ladies and gentlemen, I will now call the

17  names of the jurors who are to serve in this case.  As your

18  names are called, please come forward and take your seats in

19  the jury box.  Those whose names are not called should remain

20  seated until excused by the Court.

21               William T. Bishop, Mary Elizabeth Bryant, Christopher

22  Madison Caldwell, Barry G. Calvert, Steven Cone, Edward Clark

23  Cronise, C. Allen Gorman, Samuel William Hayslett, Derrick L.

24  Hollins, Gayle Bennett Jamison, Bonnie S. Katz, Carolyn R.

25  Kimrey, Marie A. Kivett, Marcie P. Laprade, John Edward Mills,

1  Jr.

2          Ladies and gentlemen, please stand.  Raise your right

3  hands, please.

4          THE COURT:  Just those in the jury box.

5      (Jurors are sworn.)

6          THE COURT:  Ladies and gentlemen, those of you who

7  are not selected to sit on this jury will be notified of your

8  next court appearance.  Thank you for being here today.  Thank

9  you for your patience.  You are excused.

10         Ladies and gentlemen, at this time I would ordinarily

11 give you some preliminary instructions, but I've got to bring

12 the other jurors down, so what I'm going to do is let you go

13 for lunch and we'll do those preliminary instructions when you

14 get back.

15         I just ask that you remember the important

16 instruction that you not discuss this case among yourselves,

17 not remain in the presence of anyone who might be discussing

18 it.  Should anyone attempt to speak to you about it, please

19 call it to my attention promptly.

20         You will be in recess for one hour for lunch, so if

21 you will report back to the marshal or the bailiff in one

22 hour, we will proceed from there.  So you are excused at this

23 time until 2:00 o'clock.

24         I ask the bailiff to bring down the remaining jurors.

25         Counsel, while we're waiting for the jury to come,

1  there are issues involving opening statement.  Do you-all want

2  to tell me about that between now and the time the jury gets

3  here, the excused jurors, the ones that will be here in a

4  moment?  There's been a motion made.  Do you want to tell me

5  about it?

6          MR. MOTT:  It's a defense motion, Your Honor.

7          THE COURT:  When the jury gets here, we'll stop that.

8  I think they're probably on their way.  Well, they're here, so

9  just give me about one minute.

10      (Venire members enter the courtroom.)

11          THE COURT:  Are these all the jurors that are

12  remaining?

13          THE MARSHAL:  They're on their way.

14          THE COURT:  All right.  Good.

15          Ladies and gentlemen, we have completed the jury

16  selection process in this matter.  With the first three small

17  groups of voir dires, we were able to accomplish a selection

18  of the jury.

19          I would like to thank you for your service here today

20  and your patience.  In my opinion, jury service is one of the

21  most important responsibilities of American citizenship.

22  Thank you for your service here today.

23          We will stand in recess.  Well, actually, you can

24  accompany them out, and we'll begin with the motions that

25  we're about to hear in the case.

1          Thank you, ladies and gentlemen for being here today.

2     You're excused.

3          (Venire panel is excused.)

4          THE COURT:  All right.  Go ahead.  You can begin.

5          MR. ANDERSON:  Your Honor, with respect to the motion

6     in limine that was filed early this morning, it's the belief

7     of the defendant that the question has been resolved as to the

8     first issue regarding that they have a witness who will talk

9     about an offer to purchase a business for cash.  I'm confident

10    that the remaining portion of that 302 that was at issue is

11    not coming into the case, so that's been resolved.

12         The next issue deals with information that was

13    gleaned I believe from the cell phone records of either

14    Mr. Mustafa or his wife, attempts to relate text messaging, I

15    believe, between Mr. Mustafa and his wife.

16         We would submit that that should be limited in its

17    introduction because of the marital privilege.  It is a

18    confidential communication between husband and wife that was

19    intended to be private.  They had an expectation of privacy in

20    the use of their text messaging on their individual cell

21    phones and/or computer.

22         Lastly, there is, I understand, a video that was

23    captured from the cell phone belonging to the daughter of the

24    defendant.  There may not be a confidential privilege in that.

25    We would submit that there's a 403 objection to that, and that

1   the videos that show Mr. Mustafa depicts him with sums of cash

2   and making statements to his daughter about loaning her money,

3   being broke, not having any money.  We suggest that the

4   prejudicial value outweighs the probative value, so we would

5   move that it not be introduced.

6          THE COURT:  Let me hear from the United States.

7          MR. MOTT:  Judge, just to supplement what

8   Mr. Anderson said on the first issue, there was a negotiation

9   between a man named Carl Bergman and the defendant over a

10  large purchase of an auto repair business.  Mr. Mustafa

11  offered to pay I think it was $400,000.

12         THE COURT:  He says that you-all have basically

13  resolved that.

14         MR. MOTT:  And we'll instruct him again before he

15  gets to the witness stand not to testify about any of the -- I

16  think what he would say, he did some on-line research and that

17  caused him not to negotiate further.  So we'll steer away from

18  that.  We agree with that.

19         THE COURT:  All right.

20         MR. MOTT:  The marital privilege, I believe, is an

21  adverse testimony privilege.  Again, for factual --

22         THE COURT:  No.  The marital privilege is -- there

23  are two forms of marital privilege.  There's one, the

24  privilege of keeping the spouse off the stand, and there's a

25  confidential communication privilege.  As I understand it, he

 1  claims it's a confidential communication.  Of course, I don't

 2  know whether it is or it isn't.

 3          MR. MOTT:  Well, and what the setting there is, is a

 4  search warrant was executed at the residence in the Tampa

 5  area.  A number of cell phones were seized as part of that

 6  warrant.  One of those cell phones was that of Ekhlas Mustafa,

 7  Mr. Mustafa's wife.  That cell phone was forensically

 8  examined, and several text messages pertinent to the charges

 9  in the indictment were retrieved as a result of that.  It was

10  lawfully seized.  I don't see the marital privilege barring

11  the use of that --

12          THE COURT:  Confidential communication is just like a

13  letter, isn't it?  The fact that a letter is lawfully seized

14  doesn't mean -- even if it's probative, even if it's relevant,

15  even if it tends to prove something, it still can be a

16  confidential communication that is a marital privilege

17  communication between spouses.

18          I'll give you a chance to look at it, but just

19  recognize that the fact it was lawfully seized does not end

20  the inquiry from the Court's perspective.

21          MR. MOTT:  I appreciate that opportunity.  That's not

22  anything I was going to go into on opening anyway.

23          THE COURT:  Okay.

24          MR. MOTT:  If the Court would give me an opportunity

25  to look into that issue.

1          THE COURT:  Absolutely.  It's not resolved.  It's

2    just up in the air.

3          MR. MOTT:  All right.  You know, we don't intend to

4    refer to his criminal history.  It may have come up in an

5    application for a money service business license, but we're

6    again steering clear of that issue.

7          THE COURT:  Tell me about the thing involving the

8    cash and the daughter.

9          MR. MOTT:  Yes, sir.  Of course, we're charged with

10   proving there were --

11         THE COURT:  Is this going to come up in opening

12   statement?

13         MR. MOTT:  It will, Your Honor.

14         THE COURT:  Okay.  All right.

15         MR. MOTT:  Of course, he is charged with a number of

16   offenses, basically negotiating these Treasury checks,

17   depositing them in his account, and then laundering the

18   proceeds.

19         The checks were both being deposited -- you know,

20   we've got to prove who did that.  We have records that tend to

21   indicate it, but we still have to prove who the actor was in

22   the offenses.

23         And then there were large sums of currency being

24   drawn out, 60,000 at a time, 40,000 at a time, up to 175,000

25   at a time.  During the time frame, in August 2010, of some of

Ruling

 1   the larger currency withdrawals, we have the bank records to

 2   show the withdrawals, the bank statements.  But he also sent

 3   cell phone videos to his daughter, which are, on one level,

 4   pretty humorous.  He basically says, "I can't afford to help

 5   you with your tuition; I'm broke."  And then he takes a

 6   picture of $100 bills banded into $10,000 bands.  But

 7   nonetheless, it's probative of the issues on trial in the

 8   case.

 9           THE COURT:  Is there a time frame for it?

10           MR. MOTT:  Yes, sir.  We can put a time frame, and we

11   can tie it within days of these large currency withdrawals.

12   The video actually was received, I think, on August 28th,

13   according to the forensic examination, and the cash

14   withdrawals are in that same time frame.

15           And I will add that there's no prejudice in the sense

16   of -- prejudice only that it is probative on issues in the

17   case.  There's no racial animus; there's no gender bias;

18   there's no cursing.  There's not, I'll call it, bad bias and

19   prejudice.  There's none of that in this video.

20           THE COURT:  All right.  Thank you.

21           Mr. Anderson, I'm not detecting unfair prejudice.

22   And in the event that it, in fact, is in the relevant time

23   frame involving cash, involving those withdrawals, it sure

24   appears to the Court that its probative value is not

25   substantially outweighed by a danger of one or more of the

Preliminary Jury Instructions

1  following: unfair prejudice, confusion of the issues,

2  misleading the jury, undue delay, waste of your time, or

3  needless presenting of cumulative evidence.

4         It sounds like it is probative and relevant, and I

5  don't sense any prejudice from it, undue prejudice, or unfair

6  prejudice.

7         MR. ANDERSON:  I understand the ruling, Your Honor.

8         THE COURT:  All right.  I've done it based

9  essentially -- I'm accepting what he says as essentially a

10  proffer; that it would be unnecessary for me to actually have

11  a separate hearing on it where I receive the evidence.  I

12  mean, there's no reason to think the representation of what he

13  says is in his opening statement doesn't bear those things.

14         MR. ANDERSON:  Judge, in all candor, I think it

15  has -- I mean, I would have to admit that it has some slight

16  relevance to the charge.

17         THE COURT:  Well, it sounds like more than a slight

18  relevance to me.

19         MR. ANDERSON:  Well, that was my characterization of

20  it in terms of advocacy.  And it has some humor attached to

21  it, because it was intended as a humorous communication

22  between he and his daughter.  But I think the government has

23  accurately portrayed what it depicts and am prepared for the

24  Court to rule on that.

25         THE COURT:  All right.  Well, I find that it is more

Preliminary Jury Instructions

1  probative than prejudicial, given the way it's been positioned

2  here and, therefore, I overrule your motion to exclude it.

3        We'll stand in recess for about 50 minutes for lunch.

4  And when we come back from the luncheon recess, I'll give them

5  initial instructions, and you-all can begin with your opening

6  statements.

7     (Recess taken from 1:16 p.m. until 2:19 p.m.)

8        THE COURT:  I hope everybody is ready to go.

9        I've given you some preliminary instructions, and I'm

10  going to kind of repeat a few of them here before we begin

11  with the opening statements of counsel.  And I trust you'll

12  bear with me on the fact that some of them are repeated, but

13  it's important that you reflect on some of these things during

14  the course of your proceedings and during deliberations and

15  throughout the course of the trial.

16        Now that you've been sworn, I'm going to give you

17  some preliminary instructions to guide you in your

18  participation in this trial.  It will be your duty to find

19  from the evidence what the facts are.  You and you alone are

20  the judges of the facts.  You will then have to apply to those

21  facts the law as the Court will give it to you.  You must

22  follow that law whether you agree with it or not.

23        The evidence from which you will find the facts will

24  consist of the testimony of witnesses, documents, and other

25  things received in the record as exhibits, and any facts the

Preliminary Jury Instructions

1  lawyers agree or stipulate to or the Court may instruct you to

2  find.

3          Certain things are not evidence and I will list those

4  for you now.

5          First:  Statements, arguments and questions by

6  lawyers are not evidence.

7          Second:  Objections to questions are not evidence.

8  Lawyers have an obligation to their client to make an

9  objection when they believe the evidence that's being offered

10  is improper under the Rules of Evidence.

11          You should not be influenced by the objection or by

12  the Court's ruling on it.  If the objection is sustained,

13  ignore the question.  If it is overruled, treat the answer

14  like any other.  If you are instructed that some item of

15  evidence is received for a limited purpose only, you must

16  follow that instruction.

17          Third:  Testimony that the Court has excluded or told

18  you to disregard is not evidence and must not be considered.

19          Fourth:  Anything you may have seen or heard outside

20  the courtroom is not evidence and must be disregarded.  You

21  are to decide this case based solely on the evidence presented

22  here in open court.

23          Now, there are two kinds of evidence, direct and

24  circumstantial.  Direct evidence is direct proof of a fact,

25  such as testimony of an eyewitness.  Circumstantial evidence

Preliminary Jury Instructions

1   is proof of facts from which you may infer or conclude that

2   other facts exist.  I will give you further instructions on

3   these as well as other matters at the end of the case, but

4   bear in mind that you may consider both kinds of evidence,

5   direct and circumstantial.

6          It will be up to you to decide which witnesses to

7   believe, which witnesses not to believe, and how much of any

8   witness's testimony to accept or to reject.

9          Now, as you know, this is a criminal case, and there

10  are basic rules that you must always bear in mind, and we've

11  really gone through these in a criminal case.

12         First:  The defendant is presumed innocent unless and

13  until proven guilty.  The indictment against the defendant,

14  brought by the government, is only an accusation; it is

15  nothing more.  It is not proof of guilt or anything else.  The

16  defendant, therefore, starts out with a clean slate.

17         Second:  The burden of proof is on the government

18  throughout the case.  A defendant has no burden to prove his

19  innocence or present any evidence or even to testify.  Since

20  the defendant has a right to remain silent, the law prohibits

21  you, in arriving at your verdict, from considering that the

22  defendant may not have testified.

23         Third:  The government has to prove the defendant's

24  guilt beyond a reasonable doubt.  I will give you further

25  instructions on this point later.  But bear in mind that, in

Preliminary Jury Instructions

1   this respect, a criminal case is different than a civil case.

2          Now a few words about your conduct as jurors.

3          First:  I instruct you that during the trial you're

4   not to discuss this case with anyone nor permit anyone to

5   discuss it with you.  Until you retire to the jury room at the

6   end of the case to deliberate on your verdict, you are not to

7   talk about it.

8          Second:  Do not read or listen to anything touching

9   on this case in any way.  If anyone should try to talk to you

10  about it, please call it to my attention promptly.

11         Third:  Do not try to do any research or make any

12  investigation about the case on your own.  And, you know, in

13  recent years there has been something that has occurred, and

14  it's kind of crept in, and it can cause a mistrial if a

15  verdict is rendered and it's happened, it can cause me to have

16  to grant a new trial, and that's the use of the social media

17  and independent research that some people, some jurors might

18  undertake.

19         You know, as I told you at the very beginning, when

20  we were talking about not reading anything touching on it from

21  the newspaper, or listening to the radio or TV about it if

22  there's anything on it.  But, you know, it's also very

23  important, you must not use any electronic device or media,

24  such as a telephone, a cell phone, Smartphone, iPhone,

25  Blackberry, or computer, the Internet, any Internet service or

Opening Statement by Mr. Mott

1   any web site, such as Facebook, Myspace, LinkedIn, YouTube, or

2   Twitter, to communicate to anyone any information about this

3   case, or to conduct any research about this case until your

4   verdict has been accepted, that is, at the end of the case,

5   when it's all over with.

6          You know, to disregard this instruction could wind up

7   causing this case to have to be tried a whole other time, if

8   that were the case.  So it's extremely important that you obey

9   that instruction.

10         And then do not form an opinion until all the

11  evidence is in.  Keep an open mind until you begin your

12  deliberations at the end of the case.

13         Now, if you wish, you may take notes, but if you do,

14  leave them in the jury room when you leave.  And remember that

15  they are for your own personal use.  They're not to be given

16  or read to anyone else.

17         The trial will begin here shortly.  First, the

18  government will make an opening statement, which is simply an

19  outline to help you understand the evidence as it comes in.

20  Next, the defendant's attorney may, but does not have to, make

21  an opening statement.  Opening statements are neither evidence

22  nor arguments.

23         The government will then present its witnesses, and

24  counsel for the defendant may cross-examine them.  Following

25  the government's case, the defendant may, if he wishes,

Opening Statement by Mr. Mott

1   present witnesses whom the government may cross-examine.

2           After all the evidence is in, the attorneys will

3   present their closing arguments to summarize and interpret the

4   evidence for you.  The Court will instruct you on the law, and

5   you will retire to the jury room to deliberate on your

6   verdict.

7           Now, is the government ready to proceed?

8           MR. MOTT:  It is, Your Honor.

9           THE COURT:  All right, you may.

10          MR. ANDERSON:  Your Honor, before we begin the

11  openings, may we invoke the rule, please?

12          THE COURT:  If there are any witnesses in the

13  courtroom, they are to be excluded at this time, other than

14  the two law enforcement representatives that were identified

15  previously and agreed to by counsel.  So all the witnesses in

16  this case are to be excluded at this time.  I take it there

17  are none in the courtroom other than those two?

18          MR. MOTT:  That's correct, Your Honor.

19          THE COURT:  All right.

20          MR. MOTT:  Thank you, Your Honor.

21          May it please the Court.  Ladies and gentlemen of the

22  jury, I've been introduced.  I'm Joseph W.H. Mott.  I go by

23  Joe.  I'm an assistant U.S. attorney here in Roanoke for the

24  Western District of Virginia, which covers about the western

25  two-thirds of the state.

Opening Statement by Mr. Mott

1          I also introduced briefly the people that will be at

2   the government table today.  On your far left at the table is

3   Tristan de Vega.  He is a third-year law student at Washington

4   and Lee, and they're entitled to practice so long as they're

5   in the company of a licensed lawyer.  And he will be

6   conducting the trial with me over the next several days.

7          Chris Gillenwater is an agent with the IRS.  He was

8   one of two coinvestigators in the case.  Next to him is David

9   Frey.  He's with the FBI.  He and Chris worked closely

10  together in building this case, along with a host of other

11  agents.

12         I want to thank you at the outset for your time and

13  attention.  The case is set for this week.  We're optimistic

14  that it can be done.  It may be long days getting there, but

15  it's important to both sides.  I'm sure Mr. Anderson will tell

16  you the same thing.  I'll just thank you in advance for your

17  time and attention over the next several days.

18         The Judge has outlined the trial to you.  This is

19  what's known as opening statement.  After opening statement,

20  then the evidence will come in, the government, the defense,

21  if they choose to.  And that's really what your job is going

22  to be, to listen to the evidence and then decide the facts.

23  You are really the fact finders in this case; who to believe,

24  what facts to find, what don't you believe.

25         The Judge will handle the law, but you're the fact

Opening Statement by Mr. Mott

1   finders in the case.  So that's your main job over the next

2   several days, is to listen carefully to the evidence and

3   evaluate it and then determine what the facts are.

4          After all the evidence is in, then the parties will

5   have a chance to give closing arguments to assert why you

6   should go their way, why you should believe some evidence, not

7   another, et cetera.

8          And then you'll retire to your -- the Judge will give

9   you instructions, and that's the law.  As I mentioned, he's

10  the one who will tell you what the law is.  And then you'll

11  retire to your jury room, you'll elect a person to preside

12  over the proceedings -- every meeting needs a forum -- and

13  then you'll render your verdict, which, of course, must be

14  unanimous; in other words, all of you have to agree one way or

15  the other, guilty or not guilty.  So that's a brief outline of

16  the trial.

17      We've been asking all of you a lot of questions this

18  morning about your qualifications, who you may know among the

19  parties, your familiarity with law enforcement.  You're

20  probably sitting there with one question of your own and

21  that's what is this case all about?  And this is where the

22  parties get to tell you what the case is all about, and that's

23  what I want to take my opportunity to do this afternoon.

24      What the case at its core is about is a man, Osama Mahmud

25  Mustafa.  He goes by Sam.  And he had all that he needed in

Opening Statement by Mr. Mott

 1  this world, but he wanted more.  He was a business owner,

 2  first in San Diego, then in the Tampa area, has a nice family,

 3  a daughter in medical school, a loving wife, but he wanted

 4  more.  That's the short of it.

 5      The long of it is going to be a little longer in the

 6  telling, over the next several days, and it will come from

 7  about 30-some witnesses that the government has subpoenaed to

 8  appear here.

 9      Let me start off, Mr. Workman -- I didn't introduce

10  Mr. Workman.  He's our technology person in the office.  He

11  will be displaying the digital evidence in the case as we go

12  along.

13      If you could bring up the organizational chart,

14  Government's Exhibit 1.  I'm still a little old school, so I

15  have a poster as well.  It might be easier to see on the

16  monitors.

17      Now, there are three defendants charged in this

18  indictment.  The only one you're concerned with is this

19  defendant.  I'm going to call him Sam Mustafa.  I think that's

20  what he prefers to go by.

21      As I mentioned, he lived in Tampa.  And South Florida and

22  the Florida Gulf Coast, the western part of Florida, was just

23  eaten up with fraudulent tax refund fraud.  What would happen

24  is people in low income and other neighborhoods would file

25  fraudulent tax returns.

Opening Statement by Mr. Mott

1      You may or may not know this, and I hope it doesn't

2  become too widely disseminated, but the IRS doesn't really

3  check tax returns when they're filed to verify that the

4  withholding from the W-2 fits it.  Their mandate is to

5  promptly process tax returns and issue refunds.  If there's a

6  problem with the return later, then they audit it or take

7  other steps to verify the tax return.

8      This caught on like wildfire in 2009, 2010, and people

9  were filing fraudulent returns and getting tax refund checks.

10  It basically came in two forms.  One is like a printed check

11  drawn on the United States Treasury.  The other were checks --

12  what they call Refund Anticipation Loans or RAL.  You can get

13  your money faster.  It's not much of a deal, but you can get

14  your money faster with a Refund Anticipation Loan.

15      And they would pick an address; often a dozen returns

16  would go to the same address.  They get the Social Security

17  numbers of dead people.  There is a web site called

18  ancestry.com they took the information off.  They can find

19  dates of birth and identifying information, Social Security

20  numbers of people that died.  In this case, there were returns

21  filed for people who were 109 years old, who were dead.  And

22  these returns would be filed claiming withholding that didn't

23  exist, and the refund checks would be issued.

24      Now, the trouble with that problem is then you still have

25  to negotiate it.  If you take a fraudulent Treasury check to

Opening Statement by Mr. Mott

1   your bank, you're likely to get caught, because the check will

2   come back and they'll have ID, maybe you'll be on

3   surveillance.  They'll know you as the account holder, or

4   they'll ask for your ID when you cash the check.

5        And that's where this man comes in.  They needed somebody

6   to negotiate all those checks.  He was a business owner in

7   Tampa.  He had bank accounts, and he just started taking these

8   checks and running them through his account, not taking any

9   ID.  Didn't even know -- he had several people he dealt with,

10  but they would come with batches of checks.

11       And he started depositing these checks into his account,

12  and they would pay the people somewhere, I don't know, 20 to

13  80 percent of the face value.  They deeply discounted a bunch

14  more than a legitimate check casher would charge for

15  negotiating these checks.

16       Now, also -- so what this chart depicts -- if you could

17  pull that up on the -- oh, it's up.

18       Mr. Mustafa lived in Riverview, Florida.  He had four

19  accounts that are involved in this case.  He had a lot more

20  bank accounts, but the checks all went into four accounts.

21  Other accounts were used to lauder the funds.

22       He had four accounts that the checks went through.  One

23  is Bank of America, in the name of a convenience store named

24  Short Stop.  That got closed down by Bank of America for

25  fraudulent activity.

Opening Statement by Mr. Mott

1    He opened another account, in the name of BNA Automotive,

2   at Bank of America.  That was in the corporate name, so it had

3   a different TIN than the Social Securely.  Bank of America

4   didn't pick up on it.  That got closed down.

5    For a brief time, he opened a Wachovia account with

6   another defendant in the case, Khaldoun Khawaja, and that got

7   closed down in a few days due to fraudulent activity.  And

8   then after Bank of America BNA account got closed down, he

9   went to JPMorgan Chase and ran all these checks through.

10    What this chart depicts is just the sheer volume of it.

11   In that top left part of the chart, you can see there were

12   3,661 refund checks altogether between October of 2009 and

13   April 27 of 2011, and they totaled close to $16 million that

14   went through his accounts.  Now, there are other defendants

15   that also ran checks through their account, that we'll talk

16   about in a minute.

17    Now, the way that works is, the depositor puts the check

18   in the bank and receives credit for it, and then the bank goes

19   to the U.S. Treasury and says, "Pay us the funds for this."

20   But then if the real taxpayer, the real person that is owed a

21   tax refund but didn't get it because someone stole their

22   Social Security number, if they complain, then they sign an

23   affidavit with the U.S. Treasury, and then there's what's

24   known as a reclamation.  So if that happens, the money comes

25   back.  First, it gets the bank and then it gets the depositor,

Opening Statement by Mr. Mott

1  theoretically.  So the answer to all that is, if there's a

2  reclamation involved, the bank's out the money.  If there's no

3  reclamation, the U.S. government's out the money.

4      And I'll tell you later one of the charges is bank fraud,

5  or conspiracy to commit bank fraud in this case.  So a bunch

6  of the checks came back.  We'll introduce evidence of that

7  over the course of the next few days.

8      If you could go to the lower left, Mr. Workman.

9      Also in Tampa was an associate of Mr. Mustafa, a man

10 named Khaldoun Khalil Khawaja, who goes by Tony.  And he also

11 operated a number of convenience stores, the main one being a

12 place called Main Street Grocery.  And he started receiving

13 these checks as well, but he didn't negotiate them through his

14 accounts.  A lot of them went through his brother's account --

15 if we could go to the bottom right -- which is kind of how our

16 district got involved, how it came up here.

17     Because Khaldoun Khawaja's brother is a fellow named

18 Muawia Abdeljalil, who goes by Mike, and he's another

19 convenience store owner here.  He had a convenience store on

20 Burrell Street, near Lincoln Terrace, kind of out near Orange

21 Avenue, by the interstate, and then he had a place called the

22 One Stop Shop 2 on Doe Run Road in Rocky Mount.

23     And he agreed to negotiate the checks from Tampa, in that

24 sense, for his brother.  And that's essentially how we picked

25 up on it.  We received financial reporting of fraudulent

Opening Statement by Mr. Mott

1  checks from Florida going through Mr. Abdeljalil's accounts,

2  and basically followed the money.  The money all led back to

3  Florida and Mr. Khawaja and Mr. Mustafa.  The money was sent

4  back to Florida.

5       At the very bottom of that, there's a depiction that, as

6  part of the investigation, Agent Gillenwater got records from

7  Federal Express.  And there were a number of packages flowing

8  back and forth between Mr. Abdeljalil and Mr. Khawaja, and

9  basically they were FedExing Treasury checks up and then

10  sending business checks back, to send the proceeds back to

11  Khawaja.

12       Now, this started -- as I mentioned, sometime around

13  June 2010, Mr. Mustafa had problems with his account getting

14  closed, his Short Stop account getting closed, so kind of his

15  outlet was up in the air for a minute, for a while, and

16  Mr. Khawaja started sending his checks to his brother in

17  Virginia.  All together, it was approximately about

18  $18 million of Treasury checks over the course of the

19  conspiracy.

20       If you could pull up the phone contacts.

21       You will hear over the next several days about others

22  involved besides the store owners, because the way this

23  worked, the checks would all be gathered up, and then the

24  people who knew Osama Mustafa or Khaldoun Khawaja would bring

25  them into the stores.  We've identified some of those people.

Opening Statement by Mr. Mott

1   Some of the people have been prosecuted in Florida.

2       It's spelled "Daniel," because that's how it was in the

3   cell phone contacts for Mr. Mustafa, but it's really Danielle.

4   Mahmaud Mustafa is Mr. Mustafa's son.  He goes by Mike.  He

5   was receiving these checks.

6       A lady named China Raphael, sort of an Asian woman, was

7   bringing a bunch of the checks to the store.  Another woman

8   named Shirell Bloker was bringing checks to the store.  And a

9   woman named Rashia Wilson, who used the nickname "First Lady,"

10  was bringing checks to Mr. Mustafa to negotiate.  And for lack

11  of a better term, I'll call them the brokers, because below

12  them is a broad area of people filing false tax returns.

13      But the difficulty, like in most money laundering

14  operations, is getting it negotiated.  So there was sort of a

15  funnel effect up to Mr. Mustafa and Mr. Khawaja.

16      This chart reflects, when the case came down, cell phones

17  were seized pursuant to warrants and consent searches.  Those

18  contact lists were recreated, and they showed -- this chart

19  just depicts the different telephone contacts, be they

20  telephone calls, text messages, contacts between the parties

21  in the case.

22      And I think, if my math is right, for instance, between

23  Mr. Khawaja and Mr. Mustafa, there were 3,147 contacts in --

24  what's that? -- 2 and a half years, 17 months; just a huge

25  number of contacts.  That's on the order of at least dozens

Opening Statement by Mr. Mott

1  per day between the two of them.  And it also depicts the

2  contacts between the brokers and the ones that were depositing

3  the checks.

4       Between each other, Mr. Mustafa and Mr. Khawaja charged

5  each other 10 percent to negotiate the checks.  They were kind

6  of in the business.  The people that brought the checks to

7  them, they charged between 20 percent and 80 percent.  If

8  they're having a hard time negotiating the checks, they didn't

9  really need the business, they would charge up to 80 percent,

10  give them 20 percent back of the face value, but somewhere

11  between 20 and 80 percent.  Maybe 20 to 50 was the most common

12  percentage that they would pay for a fraudulent Treasury

13  check.

14       Some of the documents -- if we could go to the

15  PowerPoint, Mr. Workman, the next slide, and if you could blow

16  up the bottom of that.

17       What that chart depicts -- that was prepared by Agent

18  Gillenwater.  What he did as part of his investigation, he got

19  all these checks, 3,600 some, put them in an Excel spreadsheet

20  and then totaled them by bank account.  And that's essentially

21  what that chart depicts.  I expect that will be introduced

22  into evidence through Mr. Gillenwater.  And somewhat over

23  4,000 checks all together.  Those bottom figures are the

24  dollar amounts and the number of checks that went through each

25  defendant's accounts.  And above in the chart, Agent

Opening Statement by Mr. Mott

1   Gillenwater listed all of the accounts.

2        Next slide, please.

3        This slide basically depicts what it looked like.  You

4   know, at the bottom there are a whole bunch of people filing

5   these fraudulent returns, and then that funneling effect where

6   they go up to the broker, the China Raphaels, the Rashia

7   Wilsons, and then ultimately to Mr. Mustafa.

8        Next slide, please.

9        I think I've talked about the phone charts, so the next

10  slide, please.

11       As I mentioned, there are a whole bunch of accounts

12  involved in this.  Over on the left are the four main accounts

13  that were used for depositing the checks.

14       The way the investigation worked is Agent Gillenwater

15  kind of worked the deposit side of it.  He got all the

16  Treasury checks and found out where they went, which account

17  did they go in, subpoenaed all the bank records, and then

18  traced the Treasury checks into those accounts.

19       At the same time, there's the Marshal's Service senior

20  inspector and analyst with the Marshal's Service that was

21  following the expenditure side.  Agent Gillenwater would

22  follow the money into the first accounts on the left-hand

23  side, and then an inspector named Mike McClung, with the

24  Marshal's Service, and a fellow named Jeff Brunner kind of

25  followed the money from there, and the assets.  And that's

Opening Statement by Mr. Mott

1  what that diagram depicts.

2       There are a number of accounts that the checks were then

3  negotiated into, and then they went further into other

4  accounts and assets.  For instance, at the top there, during

5  the course of this, Mr. Mustafa bought a business called

6  Chuck's Tires.  Paid on the order of half a million dollars

7  for it, to buy a business.  Cash went out of those accounts

8  into his personal accounts.  There are a whole bunch of

9  vehicles that were purchased with the proceeds of the checks.

10      I'm having trouble clearing the thing.  There you go.

11      And in money laundering terms, that's called layering.

12 First, in order to conceal the proceeds of the crime, you

13 place it into other assets and then kind of layer it out so

14 it's hard to detect.  And that's essentially what the evidence

15 will reveal over the next several days as to what happened

16 with the money from the Treasury checks.

17      The next slide, please.

18      The Marshal's Service analyzed this tracing and tried to

19 determine how much of it was legitimate income versus Treasury

20 check proceeds, and the results of that are summarized in this

21 exhibit.

22      From the Short Stop account, Treasury check deposits

23 accounted for 79 percent of all deposits into that account.

24 And, remember, that existed some time prior to the fraud being

25 instituted.  And actually, it was basically a defunct account.

Opening Statement by Mr. Mott

1   He had sold that business.  When the Treasury checks started,

2   he kind of reactivated it to run Treasury checks through.  But

3   in any event, about 79 percent of the total deposits into the

4   Short Stop account were from Treasury checks.

5       As to the BNA Automotive, Inc. account at Bank of

6   America, about 90 percent of all the funds that went through

7   that account were from fraudulent Treasury checks.

8       As to the Wachovia, the account that was only opened for

9   a couple days, 95 percent -- or 65 percent were from Treasury

10  checks.

11      And as to kind of the last in time account, the JPMorgan

12  Chase account, 97 percent of the funds that went into that

13  account were from Treasury checks.  There was very little

14  legitimate business activity in those accounts.

15      The next slide, please.

16      This slide merely depicts the signers on the various

17  accounts, and I don't think I need to add anything to that,

18  except for the bottom one -- or the third one down on the

19  right.  Both Mr. Mustafa and Khaldoun Khawaja opened that

20  account at Wachovia, now Wells Fargo, and it was only open for

21  a few days and a relatively small amount of money went through

22  that account.  But Mr. Mustafa was the primary signatory on

23  all of the accounts that the money went through.

24      Now, besides where the money came from, over the next

25  several days we'll show you where the money went to.

1        Next slide, please.

2        Because, as I mentioned, Inspector McClung and Jeff

3   Brunner traced the funds, and a lot of them, the majority of

4   them, went through an account at BNA Automotive, Inc.   This

5   slide depicts BNA Automotive.

6        At one point, Mr. Mustafa had put up a sign:   "Bring your

7   tax return here for a refund check."   I think his later

8   statement was nobody did that, nobody accepted the invitation.

9   But he advertised for Treasury refund checks to come to his

10  business.   It's basically an automotive repair shop, is what

11  BNA Automotive is.

12       The next slide, please.

13       That's from the Florida Secretary of State.   It just

14  shows Mr. Mustafa as the registered agent for BNA Automotive,

15  Inc.   That Linebaugh Avenue address is where it was located.

16       The next slide, please.

17       And this slide -- if you could expand the deposit ticket.

18  The Marshal's Service obtained, you know, not only the bank

19  statements but what they call the items, and looked at all the

20  deposit tickets in an effort to match the checks up to the

21  deposits.

22       And this is an example of a daily deposit at JPMorgan

23  Chase.   Mr. Mustafa would list all of the checks going in.

24  The top ones are actually RAL checks.   I mentioned the Refund

25  Anticipation Loan checks.   There's no real practical

Opening Statement by Mr. Mott

1  distinction for purposes of this case.

2      But if you could go down to regular size, and then

3  compare them, and perhaps expand the checks on the right to

4  correspond to the amounts that were placed into the account.

5      Next slide, please.

6      Similar tracing work was done for the BNA Auto account at

7  Bank of America ending in 2325.  That slide depicts similar

8  activity in a different account.

9      The other thing that was -- I'm trying to choose the

10  right adjective, but it was very large scale, were cash

11  withdrawals.

12      The next slide, please.

13      They obtained the bank records relating to currency

14  withdrawals, and there were days when Mr. Mustafa would

15  withdraw 40,000, 60,000, 175,000.  He was having conversations

16  with tellers about armored cars, because banks typically don't

17  keep that much money there.  They would have to order an

18  armored car to meet his currency requirements.

19      What the investigators did was to look at the -- if you

20  could enlarge the bottom left.  That's not one of the larger

21  currency withdrawals.  But go to the right, please.  But to

22  examine all of the currency withdrawals from those accounts,

23  because the bank statement isn't necessarily determinative,

24  and to make sure it was a cash withdrawal, they would kind of

25  look at the detail items to make sure it was correct.

Opening Statement by Mr. Mott

1    There were some instances where there were a bunch of

2  different withdrawals under $10,000.  There's a $10,000

3  reporting requirement for currency transactions.  But other

4  days there would just be these gigantic currency withdrawals.

5  Some days, you'll see in the records admitted into evidence,

6  he would go from branch to branch getting withdrawals of

7  $10,000 or under.  Other days it would just be very

8  large-scale currency withdrawals.

9    The next slide, please.  If you could expand the

10  left-hand side of that slide.

11    That's an example of a series of large-scale withdrawals

12  at different branches.  Big Bend is a branch.  Kennedy Street

13  is a branch.  Brandon is a branch in Tampa of the Bank of

14  America.

15    The next slide, please.

16    Ultimately, the Bank of America accounts were closed, and

17  he opened an account at JPMorgan Chase, again in the name of

18  BNA Automotive.  Similar activity occurred there.

19    Next slide, please.  And if you could expand maybe the

20  bottom two-thirds of that.

21    And this is an example from August to -- say,

22  August 25th, there's a $60,000 currency withdrawal at East

23  Fowler.  On the same day, there's a counter debit for $30,000.

24  The next day -- or on August 27th, there's a $60,000 cash

25  withdrawal from the West Brandon branch.  Another $30,000 cash

Opening Statement by Mr. Mott

1    withdrawal from the Brandon branch.  All those in August of

2    2010.

3        Now, I've been focusing on the withdrawals, but there are

4    corresponding deposits of Treasury checks to balance up with

5    the huge cash withdrawals, and that will be apparent from the

6    bank records that are entered into evidence.

7        Now, at the same time, he was sending photos via text

8    phone to his daughter.  And -- next slide, please -- on one of

9    those, he took a picture.  And you can see the top.  It was

10   sent on August 28th of 2010, and that's when it was received.

11       This evidence was obtained off of Sahab Mustafa's iPhone.

12   Sahab is his daughter.  When the case was taken down on

13   May 15th, 2012, she's at the scene of the search warrant.

14   They obtained her cell phone; this image ensued.  And he took

15   a still photo of currency sitting on the seat of his vehicle.

16       And perhaps you could expand some of the bands.

17       You can even tell those are $10,000 bundles of $100 bills

18   banded with the date of August 24th of 2010.

19       The next slide.

20       And that same day he sent a cell phone video to his

21   daughter.  It's probably the same scene.  I think you'll see

22   that same currency sitting in the seat of his vehicle.  But

23   he's sending -- he sent this video to his daughter.

24       (Video is played.)

25           MR. MOTT:  And I think the evidence will be his

Opening Statement by Mr. Mott

1    daughter is in medical school, still is, I believe, at the

2    time of that video.

3            So where did the money go?  You'll hear about that

4    over the next few days as well.

5            The next slide, please.

6            Mr. Mustafa is kind of an automotive guy.  He bought

7    a place called European Autohaus -- it specializes in European

8    cars -- with the funds from the fraudulent Treasury checks.

9            Next slide, please.  Back up a slide or two, if you

10   could.  The next slide.

11           He also purchased a Mercedes GL550.  I don't know if

12   you can see it, but the amount on that is 68,000 some that was

13   used to purchase the Mercedes.  And, again, Agent McClung

14   followed the money from the Treasury checks, through the four

15   Treasury check depository accounts, through other bank

16   accounts, and then to the ultimate assets.

17           Next slide, please.

18           He purchased a 2011 Porsche Panamera with it.  If you

19   could blow up those two checks.  The total purchase price was

20   close to $100,000 for the Porsche.

21           Next slide, please.

22           He bought a 2011 Hyundai Tucson for about $22,000

23   with the proceeds of the Treasury checks.

24           The next slide, please.

25           He bought a red BMW -- if you could expand the -- for

Opening Statement by Mr. Mott

1  about 37,000 some -- it was used -- for the purchase of the

2  BMW.

3           The next slide.

4           He bought an Acura TL with -- well, we may be out of

5  order here.

6           Funds were used to purchase some real estate at an

7  address on Mountain Bay Drive in Riverview, Florida.

8           And, again, this chart just depicts the work of

9  tracing financial records through accounts, and ultimately

10 into the assets.  And that wound up being a wire for $78,000

11 to a settlement company.

12          Next slide, please.

13          A bunch of money, about $700,000, went for the

14 construction of a house in Seffner, Florida.  It's in a

15 subdivision there.  It's kind of overbuilt for the

16 neighborhood.  But he paid a builder named Michael Benitez

17 about $700,000 for that house.

18          And what was even odder about that is that he was

19 paying it up front.  Usually in a construction job, you make

20 progress payments; as the work is completed, the bill gets

21 paid.  Here Michael Benitez was paid up front for the

22 construction.

23          Next slide, please.

24          This depicts the money flow and the payments for the

25 Seffner house that was under construction.  That's close to

Opening Statement by Mr. Mott

 1    completion now.

 2              Next slide, please.

 3              He bought a house at Saddle Gold Court in Brandon,

 4    Florida, with the proceeds.  Again, money was traced.

 5    Ultimately, $134,000 went through a settlement company for the

 6    purchase of all that, of that article of real property.

 7              Next slide, please.

 8              Purchased yet more real estate, a house at Annadale

 9    Drive in Wesley Chapel, Florida.  The ultimate disposition was

10    a wire involving a title company.  And, again, the money was

11    traced through different accounts before it got to the real

12    estate.

13              Next slide, please.

14              He purchased stock in a company called Dataguise.  I

15    think this here is a print from the web site for Dataguise.

16    It's like security, a technology security type of company.

17              And if you could blow up the top left.

18              He invested about $120,000 of proceeds from check

19    fraud into that company.

20              Next slide, please.

21              The marshals also trailed $50,000 into the purchase

22    of stock in a company called Point Inside, Inc., again,

23    following the money from the Treasury checks, through various

24    accounts, into that asset.

25              So that's where the money came from and where it

Opening Statement by Mr. Mott

 1  went.  As I mentioned, the agents basically followed the money

 2  back to Florida.

 3          Ultimately, an indictment was returned.  They started

 4  the investigation, I think, in October of 2010.  In May of

 5  2012, an indictment was returned.  We went to Florida to

 6  execute a search warrant and effect arrests of the defendants.

 7          And on May 15th of 2012, Mr. Mustafa was arrested in

 8  Florida.  He was taken into custody by a couple of Florida FBI

 9  agents, a woman named Amy Pittman and a Task Force Officer

10  named Randy Hierlmeier, and he was advised of his Miranda

11  rights and elected to speak to the agents about the Treasury

12  check fraud.

13          And he told them that he got involved in or about

14  September of 2009 with Tony, Khaldoun Khawaja, and he told

15  them that Mr. Khawaja came in to get his car repaired at his

16  shop, and Mr. Mustafa asked him where he was getting all his

17  money, and that Tony said that he cashed checks.  And Tony

18  asked if Mr. Mustafa could take some of the checks, and Tony

19  told him that the checks were from people who were in jail and

20  couldn't cash the checks themselves.  So Mustafa agreed.

21          He received 10 percent for negotiating the checks.

22  Later he said it was reduced to 7 percent, when the quantity

23  increased.  And Tony, according to Mustafa, told him that he

24  was getting 25 percent on each check.

25          Mr. Mustafa stated that his main source of Treasury

Opening Statement by Mr. Mott

1  checks was Tony, that Tony was bringing the checks to him, and

2  that after cashing the checks, Mr. Mustafa would bring the

3  money back to Mr. Khawaja.

4       He said that his first involvement with the scheme

5  was when he took a stack of checks to Bank of America and

6  deposited it into his Short Stop account.  He had a business

7  called Short Stop that he sold.  The account was defunct --

8  the business was defunct, but the account was still there, and

9  he deposited some of the checks in the Short Stop account.  It

10  had closed, but the account was open.

11       Mr. Mustafa said, when he first approached the

12  teller, he didn't think the bank would take third-party

13  checks, but they did, and so he did, and continued doing it,

14  according to Mustafa.

15       He later learned the bank had closed his Short Stop

16  account and said the statement had an $888,000 negative

17  balance.  And he also related to the agents about reclamations

18  coming back against the account.

19       Mr. Mustafa told the agents that Tony was getting

20  checks from six to seven black females.  I think that's

21  essentially what the evidence will be in the case over the

22  next few days.

23       He described a woman named First Lady, who is a black

24  female with gold teeth, drove a black BMW X5, sometimes

25  brought checks to BNA with her sisters.

Opening Statement by Mr. Mott

1    He described a woman named Shirell –– didn't know her

2  last name –– as another black female who provided checks to

3  Tony.  He also described China as another black female who

4  took checks to Tony.  And also described another woman, who

5  drove an Impala or Malibu, that Tony got checks from.

6    He said that he had all the phone numbers for these

7  people in his phone, and that was true.  Later his phone was

8  examined by a forensic examiner, and the contacts were in the

9  contacts list.

10    Mr. Mustafa said he thought the checks were okay, but

11  when he started to see people on the news get arrested, he

12  knew it was illegal.

13    After a while, Mr. Mustafa said that he started

14  dealing directly with the females and cutting Tony out.  And

15  he said the girls would call Mustafa, and he would go to BNA

16  and meet with them at BNA.  And then that activity went on all

17  through 2010 and 2011.

18    First Lady, he said, would come to BNA every other

19  day, sometimes every day.  Six to seven girls per day were

20  coming into the shop, and each time they brought four to five

21  Treasury checks.  Mr. Mustafa said each check was valued

22  between 3- and $6,000 and had either a Tampa or Miami address

23  on it.  That, I think you will find, was also true.  The

24  checks were either for locations in the Tampa or Miami areas.

25    He said that each check was already endorsed before

Opening Statement by Mr. Mott

1  he purchased it.  He said he never asked for nor received

2  identification for any of the checks.  He said that sometimes

3  the checks were fake, meaning they were counterfeit, and that

4  sometimes the checks were stolen from other people who were

5  dealing in fraudulent Treasury checks.

6         Mr. Mustafa said that in or around December 2010, he

7  and Tony went to Wachovia together to open a bank account, and

8  then the bank account was closed the next day.  Mustafa stated

9  that if the bank did their job, we wouldn't be here now.  And

10 I think the first part of that is going to be true; that

11 Wachovia account was open for a few days.  I think it was

12 actually November 2010, but they had opened a bank account

13 together.

14        Mr. Mustafa said that he opened a Bank of America

15 account through a bank manager named Alex.  I expect one of

16 the government's witnesses will be a bank manager named Alex

17 Goicoechea, who dealt with Mr. Mustafa.

18        He said he applied for a third-party check-cashing

19 license with Bank of America -- that was true -- and that he

20 was given a temporary license.  He did have an application

21 pending with the State of Florida for a period of time, and he

22 kept getting extensions while he was negotiating checks.

23        Mr. Mustafa told the agents that he never received a

24 legitimately filed U.S. Treasury refund check.  He said he

25 never took a check with a real identification or driver's

Opening Statement by Mr. Mott

1   license.  He said he never received a check as payment for a

2   vehicle at BNA.  He said he never took a Treasury check as

3   payment for towing services.  And he said he put up a

4   check-cashing sign at BNA, the one you saw a little while ago,

5   and not one, expletive, person came.

6        He told the agents, Agent Pittman and Task Force

7   Officer Hierlmeier, that he knew it was a matter of time

8   before he was caught.

9        He told them that he received 7 percent, later

10  10 percent from Tony's checks during the time that he and Tony

11  conducted business together.  Mustafa gave Tony approximately

12  15 to $16 million in cash.  I think you'll find that's

13  approximately correct.  He said he gave Tony $500,000 on one

14  occasion.  He claimed that Tony was sitting on $20 million,

15  and that he only made about $750,000 out of the operation.

16       The agents started asking about family members.  At

17  one point, Mr. Mustafa became angry, ended the interview, said

18  he wanted to talk to an attorney, but then as the agents were

19  kind of putting their papers away, he said, "Never mind.  I'm

20  cool.  I want to talk to you again," so they continued to

21  interview him.  And at that point, his family was a touchy

22  topic, and he said he is doing this for his family.

23       And he offered to help them with others that were

24  involved with the Treasury checks.  He described a guy named

25  Juce, who is probably the biggest broker of fraudulent

Opening Statement by Mr. Mott

1    Treasury checks, gave a physical description and -- a

2    description by context.

3         He said his son Mike was -- Danielle.  He said he was

4    dating Danielle at one point, and that Danielle was involved

5    in the Treasury checks.

6         Mr. Mustafa said he met Juce when he was at Tony's

7    place, and got checks from Juce through Danielle.  He said

8    that the last time he dealt with Juce was about three months

9    ago, three months before May of 2012.

10        The interview stopped at that point.  Mr. Mustafa was

11   transported to the FBI office.  There were court hearings

12   later that day.  He started to make comments during the

13   transport that when he saw news about these arrests, he knew

14   he was going to get caught, that his time was limited.  His

15   words were, "It's just a matter of time before, quote, 'we got

16   caught.'"

17        He described other people, including a man named Asem

18   Hasan, who lived in Cheval, and that he and Hassan did a few

19   checks together.

20        When he arrived at the FBI office, Mr. Mustafa told

21   Agent Pittman and Task Force Officer Hierlmeier that he was

22   sorry for what he did, that he was ashamed and embarrassed for

23   his family, and that he took full responsibility for what he

24   did.

25        At the FBI office were Special Agent David Frey and

Opening Statement by Mr. Mott

1  me.  And, of course, we were interested in the Virginia end of

2  the Treasury check operation.  And he was again interviewed

3  after his arrival at the FBI office.  Present were Agent Frey,

4  me, and intermittently Agent Pittman and Task Force Officer

5  Hierlmeier.

6        And at the beginning, he apologized several times for

7  what he had done, talking about the check activity.  He

8  indicated that, although he put a sign in front of his

9  businesses that he would sell cars for refund checks, he never

10 had one transaction where somebody paid for a car with a

11 Treasury check, although he really hoped someone would.

12       He said that Tony had got him involved in the refund

13 check activity.  And he estimated that he took receipt of the

14 first four or five checks sometime in or after August of 2009,

15 and at that point in time, it was his understanding that Tony

16 was supplying three other people with checks.

17       Mr. Mustafa said he initially used his Bank of

18 America Short Stop account to deposit the refund checks with

19 Tony, and then he was no longer doing business at the time he

20 deposited the first refund check with Tony, but that the

21 checking account was still open.

22       He was asked about matters in Virginia.  He said that

23 maybe his son Mike would know more about it, because Mike was

24 working with Tony and around when he was sending the checks to

25 Virginia.

Opening Statement by Mr. Mott

1          But he also said that the volume of checks going to

2   Muawia in Virginia likely increased in May or June of 2010,

3   because that's when his bank account was first shut down.  And

4   I think that will align with the rest of the documentary

5   evidence from the bank records.

6          He said he never actually saw Tony's refund checks

7   being shipped to Muawia in Virginia, but that he was told

8   about the practice by his son Mike, and that Mike had told him

9   that Tony was sending FedEx packages containing checks to

10  Muawia in Virginia, and that Mr. -- and that Muawia would send

11  the green back to Tony, meaning he would return the cash so

12  more checks could be purchased.  And, again, he said that his

13  son Mike would know more about this.

14         Mr. Mustafa said it was his understanding that Tony

15  provided all the refund checks to Muawia, and it was never the

16  other way around, and he did not know if Muawia had ever

17  obtained refund checks and sent them to Tony in Tampa.

18         Mr. Mustafa said that Tony initially paid him

19  10 percent to deposit the checks, but then Tony later reduced

20  the fee to 7 percent when the volume of checks increased, sort

21  of a volume discount.

22         He again talked about ultimately buying checks

23  directly from five to six girls and then providing the checks

24  to Tony.  When he bought the checks directly from people on

25  the street instead of getting them from Tony, Mr. Mustafa said

Opening Statement by Mr. Mott

1    he paid 70 percent of the face value of the refund checks.

2    And he said that he was undercutting Tony, who he was charging

3    more, and was not paying as much for the checks as Mr. Mustafa

4    was.  He again mentioned several of the suppliers that he had

5    in common with Tony, including Danielle, the First Lady, and

6    Juce.

7            He went into some other matters as well.  Both

8    interviews went on for a considerable period of time, on the

9    order of hours, there upon his arrest in Tampa.

10           Now, that's essentially what the evidence is going to

11   be over the next several days.

12           Now, the charges, to give you a very brief

13   description, but there are basically three charges in the

14   indictment.  Mr. Mustafa is charged with conspiracy to defraud

15   the United States, receive fraudulent Treasury checks,

16   negotiate checks bearing fraudulent endorsements, and to

17   receive stolen property.  That's one count, conspiracy to

18   defraud, receive U.S. Treasury checks.

19           Count Two of the indictment charges a conspiracy to

20   commit bank fraud, and depending on the reclamation, the loss

21   either falls on the government or on the bank.  Count Two

22   charges a conspiracy to commit bank fraud, and Count Three

23   charges a conspiracy to commit money laundering.

24           And Judge Wilson is going to tell you what the law is

25   at the end of the case.  I do that to alert you, because I

Opening Statement by Mr. Anderson

 1  think, you know, using this as a road map, where you kind of

 2  know where a case is going, you know, what to focus on, what's

 3  important, and what's not important as the evidence comes in.

 4       I think Judge Wilson will tell you something in the

 5  nature of a conspiracy is an agreement to commit a crime.  Two

 6  or more people agree to commit a crime.  That's the essence,

 7  the gist, the bottom line of a conspiracy.

 8       Now, Count One, the conspiracy to defraud, I think

 9  that's sort of -- you probably have a natural understanding of

10  that kind of stuff with the bank fraud.  Probably similar to

11  Count Three, the conspiracy to commit money laundering.

12  That's reaching an agreement to conduct financial transactions

13  with the intent to conceal the source of the funds of the

14  unlawful activity, or to avoid a transaction reporting

15  requirement, like a $10,000 reporting requirement.  And,

16  again, Judge Wilson will instruct you in the law of the case

17  after all the evidence is in.

18       And, again, I want to thank you for your attention in

19  the case.  And we'll move this as expeditiously as we can.

20  And at the end of the case, I'll address you again in closing

21  argument, and I will ask each of you to return a verdict of

22  guilty of all three counts.  Thank you.

23       THE COURT:  Mr. Anderson, would you like a brief

24  recess before we --

25       MR. ANDERSON:  May we have a brief recess?

Opening Statement by Mr. Anderson

 1          THE COURT:  Ladies and gentlemen, we'll take a brief

 2   recess before concluding with opening statements, and so we'll

 3   take about a five- or ten-minute recess.

 4          (Recess taken from 3:27 p.m. until 3:45 p.m.)

 5          (Government's Exhibit Numbers 3 and 4 were marked for

 6   identification.)

 7          THE COURT:  All right.  Mr. Anderson.

 8          MR. ANDERSON:  Thank you, Your Honor.  May it please

 9   the Court, the United States, and you, ladies and gentlemen of

10   the jury.

11          I can't recall just a few short of hours ago which

12   panel each of you were in as we began the jury selection

13   process, or if we had the whole venire members here initially.

14          There was a moment when the Court called for counsel

15   to approach the bench, and my partner started in that

16   direction.  You might have seen her take a little stumble

17   there on the carpet.  It's because she had a fall earlier, and

18   her foot is in one of those boots.  And I promised I would

19   work that little slip into my opening statement, because I can

20   promise you a couple of things about Ms. Friedman:  She is

21   definitely agile, and she is quite certainly mobile, and

22   unequivocally she can be hostile.  So I'll make sure not to

23   try to get her too hostile with me during these proceedings.

24          It was the summer of 2009, and Mr. Mustafa was about

25   his business of running Billy Nelson Automotive, or BNA

Opening Statement by Mr. Anderson

1   Automotive, in Tampa, Florida.  You will hear a lot about that

2   business over the course of the next several days.

3        And he was approached by a friend, what he believed

4   to be a friend at the time.  His name was Khaldoun Khawaja,

5   also known as Tony.  You'll see some charts that the

6   government has; maybe even some, if we are fortunate enough to

7   get a team like this, which we probably aren't -- we'll put

8   together the best we can some charts for you.  Think of him in

9   terms of Tony, Tony Khaldoun Khawaja.

10       And he approached Mr. Mustafa, and he said to him,

11  you know, "I've had this windfall of money, and I'm able to

12  buy vehicles for some of my girlfriends, and I'm able to have

13  some repairs done for that."

14       Mr. Mustafa said, "How did you get all this, Tony?"

15       And the evidence will be, I suspect, that he told him

16  that, "I got it -- Tony to Sam, "I got it from cashing some of

17  these Treasury checks."  He said, "Would you like to do some?"

18       He said, "I don't know.  Tell me about it."

19       Mr. Tony Khaldoun Khawaja, the evidence will be, I

20  suspect, suggested to him that he had been using his own bank

21  account, a SunTrust Bank account, in the Tampa, Florida, area,

22  but that he needed help with someone who was a check casher.

23       You're going to learn through the course of the next

24  several days that, in the State of Florida -- we'll focus on

25  that -- in the State of Florida, you can become a third-party

Opening Statement by Mr. Anderson

1  check-cashing individual, and you have to comply with the

2  money service banking rules.  You can apply to the bank to get

3  that designation, and you apply to the State of Florida for

4  that designation to be a check casher.  And Mr. Khaldoun knew

5  that.  He couldn't qualify, so he tried to pick out somebody

6  in his community that he knew who could.  Guess who he picked?

7  He picked Sam Mustafa.

8         The evidence will be, I suspect, that Mr. Mustafa

9  originally took about 12 checks from Tony, deposited them into

10 an account -- you'll learn about it -- called the Short Stop

11 account.  And from that, from that, this gentleman, who the

12 government would suggest to you is a bank defrauder and a

13 money launderer, wrote checks from that account to Mr. Tony

14 Khaldoun Khawaja, leaving a beautiful paper trail, as any

15 businessman would do, to suggest exactly what he was doing and

16 have a record of it.

17        Now, Mr. Khaldoun at that time, the evidence will be,

18 had as his business in the area of Tampa, Florida, called Main

19 Street Grocery.  The evidence will be that there were people

20 that formed a line that went out that door, waiting to come

21 into Mr. Tony Khaldoun Khawaja's store to negotiate their

22 Treasury checks.  Sam Mustafa is not there.  He was never a

23 part of that.

24        In May of 2011, in conjunction with law enforcement

25 in the Tampa area, the evidence will be they had an operation.

Opening Statement by Mr. Anderson

1    I think you'll hear it referred to at some time as Operation

2    Rainmaker.  It's where they were trying to find the source of

3    this illegal activity regarding these Treasury checks, people

4    who were the preparers of those fraudulent returns.  They were

5    trying to focus on who they were and how to get at that

6    process.

7            Guess where they ended up in May of 2011?  I suspect

8    the evidence is going to suggest to you at Mr. Khaldoun

9    Khawaja's place of business, at the Main Street Grocery.  They

10   sent in an undercover operation, a cooperating witness, with

11   an investigator acting in an undercover capacity, and they

12   filmed Mr. Tony Khawaja Khaldoun -- Khaldoun Khawaja.  They

13   filmed him negotiating with this undercover operative, and

14   they negotiate how much he would pay for this Treasury check.

15   Got it all on tape.

16           As a result of that, they executed a search warrant

17   at Main Street Grocery some several weeks later, and they

18   found Mr. Tony Khaldoun Khawaja in possession of some cash,

19   Treasury checks, and a firearm.  And he was charged in the

20   Middle District of Florida with being a felon in possession of

21   that firearm that he was using during that time, it was

22   alleged, while he was there conducting his operation, and he

23   was prosecuted on that.  The evidence will be, I expect, he

24   went to trial and was convicted.

25           And at some point after that, the government agents

Opening Statement by Mr. Anderson

1   went to speak with Mr. Tony Khaldoun Khawaja, and he

2   implicated for the first time -- not in his initial interview,

3   but some several weeks after that, he indicated that he had

4   Mr. Sam Mustafa as an individual that was cashing checks for

5   him.

6           Now, up until that time, Mr. Mustafa's name wasn't

7   associated with any of this investigation.  It had focused on

8   Mr. Khaldoun Khawaja, whose brother is Mr. Abdeljalil.  You

9   know how Khaldoun is Tony?  Mr. Abdeljalil is Mike.  And Mike

10  had grocery store businesses here in the Western District of

11  Virginia, convenience-type stores.  And Mr. Tony had been

12  sending Mr. Mike these checks to be cashed.  The evidence will

13  be that Mike cashed those checks.

14          Now, here's the connection:  During that time frame,

15  there was one check that went from Mr. Mustafa's account to

16  Tony Khaldoun Khawaja, that ended up in Mr. Abdeljalil's

17  account in Virginia.  That's the one check, one connection

18  that Mr. Mustafa had.

19          I'm going to ask you to in your mind flash to

20  May 15th, 2011, about 9:00 in the morning.  Federal agents,

21  possessed with warrants to search and arrest, descend on the

22  home of Sam Mustafa.

23          His daughter, who you have heard some about, who

24  we've heard her name is Sahab, she was in class at medical

25  school at the University of South Florida.  You will hear that

Opening Statement by Mr. Anderson

1    agents descended there, took her from that school, out of

2    class, brought her to the home where her mother and father

3    were, and the agents began to search.  They conduct a search

4    of that residence pursuant to a search warrant, and they also

5    have an arrest complaint for Mr. Mustafa.

6           And that is the first time, the evidence will be,

7    that Mr. Mustafa ever heard of Roanoke, Virginia.  In fact,

8    the evidence will be he thought it was pronounced Roanokee

9    [phonetic].

10          He was taken to the judicial district there in the

11   Middle District of Florida, before a judicial officer, after

12   being questioned by the authorities.  You've heard the

13   government refer to that this morning.  Mr. Mustafa didn't try

14   to hide anything.  He told them where he was, what he had

15   done.  You've heard him say he was sorry for it.

16          They take him in front of a magistrate judge.  He is

17   granted bond.  And after that hearing, for about the next two

18   months, the evidence will be, he remained in the government's

19   custody, being transported from Tampa to Oklahoma City,

20   finally to Roanoke, Virginia, and held there until he was able

21   to meet the terms and conditions of his bond that that

22   magistrate had set for him.

23          You will hear, and I expect the evidence will be,

24   that Mr. Mustafa applied for, with the State of Florida, a

25   third-party check-cashing license.  I expect the evidence will

Opening Statement by Mr. Anderson

1  be that he applied with the Bank of America for such a

2  license, using his true accounts, his true identity, his true

3  names, his true addresses, the true names of his children, the

4  true names of his wife.

5       Mr. Mustafa, I expect the evidence will be, did not

6  engage in an agreement with anyone to commit banking fraud and

7  money laundering.  Mr. Mustafa, as you've heard from his

8  statements, knew that some of the checks he was getting and

9  the cash he was taking was in some way defrauding the United

10  States Government.

11      They followed, as the government has suggested, the

12  money.  Mr. Khaldoun Khawaja got checks.  He said, "Wait a

13  second.  These checks aren't working.  We got to turn them

14  into cash."  Mr. Mustafa would take the cash and he would

15  deliver it to Mr. Khaldoun Khawaja, Tony.

16      Now, when this investigation started, Tony was at the

17  top of the chart, and then it was his brother, Abdeljalil, and

18  then it was Mr. Mustafa.  The evidence will be that Tony

19  Khaldoun Khawaja has entered a plea in this indictment and has

20  expected in return for his cooperation some sort of leniency.

21  I expect the evidence will be that Mr. Abdeljalil has entered

22  a plea in this case.  And the only person left standing in

23  this investigation, this indictment, is Mr. Mustafa.

24      Mr. Mustafa asks you to consider this evidence.

25  Consider specifically what he has been told by the bank people

Opening Statement by Mr. Anderson

1   that he's worked with, the applications made with the bank,

2   the letters sent to him from the bank about the closures of

3   the accounts.  I submit to you that the evidence will be that

4   not in one of those letters did it suggest to Mr. Mustafa he

5   was committing bank fraud and/or money laundering.  It's for

6   those reasons that he asks you to listen to this evidence

7   fairly and consider what his actions amount to.

8           I expect you will hear from his daughter, who will

9   tell you that her father and their culture deals with she and

10  her mother in a way that might be different than some of us;

11  not in a malicious way, but in a way that might have some

12  scant source of humor to it, and that he would oftentimes send

13  her text messages and/or video messages in that text format

14  where he was joking with her.

15          He is, the evidence will be, without a doubt

16  considerably proud of the accomplishments that she's made at

17  such a young age, in terms of her sailing through

18  undergraduate school, about a three-year program, and now

19  medical school on the same track, soon to be working in the

20  obstetrics area.

21          In his culture, the evidence will be, women don't

22  enjoy that type of respect.  And I submit to you, and you'll

23  hear the evidence, that she does, and his pride for her

24  overrunneth his cup.

25          He cooperated initially.  You've heard some, if not

Opening Statement by Mr. Anderson

1   most, of the statements that he made to the officers that

2   placed him into arrest before he was taken into detention.

3   And one of the things that he said to them with regard to when

4   they started to say something negative about his family, he

5   wanted to cut it off and said, "I'll take a bullet for them."

6   And I think cooler heads prevailed and they got back to the

7   subject at hand.

8          And I think and I anticipate that you'll hear from

9   some of this evidence that there were times where safety

10  deposit boxes were used.  And, again, Mr. Mustafa used the

11  safety deposit boxes in the correct names, the correct

12  identities, all of the identifiers.  There's no fraudulent

13  identity in any of it with regard to his wife and his

14  daughter, and they accessed some of those funds.

15         You will hear from the evidence that from that day in

16  May, May the 15th and thereafter, the government descended on

17  Mr. Mustafa and all of his belongings.  Every item,

18  essentially every account, every piece of property frozen.

19         You'll hear from the evidence that Mr. Mustafa was

20  born in Gary, Indiana.  His family moved from that area, after

21  his birth, to Chicago.  He was raised, grew up in the south

22  side of Chicago.  He is a natural born citizen of the United

23  States.  He was educated in Chicago in trade schools as an

24  auto mechanic in the auto repair field.

25         He later moved from Chicago, went to San Diego, and

Opening Statement by Mr. Anderson

1    his family had a successful businesses while there.  Then

2    about 2004, he relocated his family to the Tampa, Florida,

3    area, where he began his career with some gas stations and

4    convenience-store type businesses.

5          And there came an opportunity for him to purchase

6    Billy Nelson Auto and he did.  And Billy Nelson Auto, you'll

7    see from the evidence, was a successful and well-run auto

8    repair/used car, high-end European vehicle sales, and he

9    worked that business well until his arrest in May, and that

10   business was ultimately closed.

11         When you have this opportunity over this next week to

12   hear the evidence and examine the witnesses and see what each

13   and every exhibit means, you'll see that Mr. Mustafa made some

14   mistakes.  But Mr. Mustafa is not, I submit to you, the

15   evidence will submit to you, not the individual that the

16   government says he is.

17         It's not going to be who has the most witnesses or

18   the most exhibits or the most elaborate.  All we can do is

19   respond to the allegations that have been leveled against him.

20   He can admit and apologize when he is wrong, I submit, as he

21   has done, but he can't, he can't admit to or agree that he has

22   violated the laws with regard to the substantive counts the

23   government has charged him with.

24         I will submit to you and ask you to examine clearly,

25   with these thoughts in mind, what I suggest to you this

Mathers - Direct

```
 1  evidence will be, we anticipate it will be, to look at it
 2  through those glasses of doubt, those glasses you've all told
 3  us that you understand the standard, you promised you could
 4  follow the instructions of the Court, and balance it, balance
 5  it on the doubt of whether Mr. Mustafa has violated these
 6  laws.  I submit to you, after you hear all this evidence,
 7  you'll be able to deliberate collectively and return a verdict
 8  of not guilty as to those counts.
 9          Thank you for your time and attention.
10          THE COURT:  Call your first witness.
11          MR. MOTT:  Your Honor, the first evidence will be --
12  defense has graciously agreed to stipulate to the authenticity
13  of certain phone records and bank records, FedEx records,
14  Florida DMV records, and auto auction records.  And it's been
15  premarked as Government's Exhibit 3, so we move the entry of
16  Number 3.
17          THE COURT:  I take it no objections to Government's
18  3.
19          MR. ANDERSON:  He has correctly recited it, Your
20  Honor.  No objection.
21          THE COURT:  Number 3 will be received.
22      (Government's Exhibit Number 3 was received.)
23          MR. DE VEGA:  May it please the Court, ladies and
24  gentlemen of the jury, the government's first witness is
25  Timothy Mathers.
```

Mathers – Direct

1          TIMOTHY MATHERS, GOVERNMENT'S WITNESS, SWORN

2                     DIRECT EXAMINATION

3    BY MR. DE VEGA

4    Q    Good afternoon.  Please introduce yourself to the jury.

5    A    Timothy Mathers.

6    Q    Mr. Mathers, who do you work for?

7    A    The Internal Revenue Service.

8    Q    And how long have you been with the IRS?

9    A    28 years.

10   Q    If you could please just briefly describe your work with

11   the IRS to the jury.

12   A    For the first ten years, I was a tax examiner in

13   processing.  The following nine years, I was an investigative

14   aide in criminal investigations, and do my current job as a

15   core witness coordinator for the past nine years.

16   Q    If you could briefly describe how tax refunds are

17   processed.

18   A    The tax returns?

19   Q    Yes.  Sorry.

20   A    Electronic returns are basically submitted very quickly.

21   Either the preparer or the taxpayer themselves will complete

22   the return, submit it electronically to the IRS.

23        The first step is checking the Social Security number

24   with the name, make sure they match.  If so, the return goes

25   on to our national computer database for processing, basically

Mathers – Direct

1  correcting math errors and checking to see if there's any

2  documents missing.  If there's no mistakes, the return is

3  finished processing, and a refund is issued to the taxpayer,

4  if a refund is due.

5         MR. DE VEGA:  Your Honor, permission to approach

6  defense counsel.

7      (Discussion off the record between Mr. de Vega and

8  Mr. Anderson.)

9         MR. ANDERSON:  No objection to these documents, Your

10 Honor.

11        MR. DE VEGA:  Your Honor, permission to approach the

12 witness.

13        THE COURT:  You can hand the exhibits to the bailiff,

14 please.

15 BY MR. DE VEGA:

16 Q    So what I have there is, I'm showing you what will be

17 marked as Government's Exhibit 4.  Have you seen these

18 documents before?

19 A    Yes.

20 Q    Can you please identify them?

21 A    The first tax return is for a Charles Dunlap.  Second one

22 is James Causey, Herbert Jones, William A. Peoples, Randy

23 Reisel.

24 Q    Thank you.  Are these documents fair and accurate copies

25 of individual tax returns?

Mathers - Direct

1  A    Yes, they are.

2          MR. DE VEGA:  Your Honor, the government moves to

3  enter Government's 4 into evidence.

4          THE COURT:  It will be received.

5      (Government's Exhibit Number 4 was received.)

6          MR. DE VEGA:  We also move to publish Government's 4

7  to the jury.

8          THE COURT:  How do you propose to do that?

9          MR. DE VEGA:  We actually --

10          THE COURT:  Go right ahead.

11          MR. DE VEGA:  Thank you, Your Honor.

12  BY MR. DE VEGA:

13  Q    Mr. Mathers, I would like to draw your attention to tax

14  returns for Herbert Jones.  Was this return properly filed?

15  A    Yes, it was.

16  Q    And is there anything on this return that would signal to

17  the IRS processing department that these returns are not

18  legitimate?

19  A    No, sir.

20  Q    Does the IRS verify the legitimacy of tax returns prior

21  to issuing tax refund checks?

22  A    No.  The people in processing are not trained to analyze

23  returns like that.  There are departments after processing

24  that do analyzation like that.

25  Q    Why doesn't the processing department verify the

Mathers - Direct

 1  legitimacy of the tax returns prior to issuing these checks?

 2  A    The thought process with the IRS is most people are true

 3  and honest taxpayers, and if we held -- if processing analyzed

 4  every return that came through there, it would delay refunds

 5  for the good, honest taxpayers, and the IRS does not want to

 6  do that.

 7           THE COURT:  Is there not like a central data bank

 8  where you go, well, this Social Security number goes to this

 9  person.  This person is alive or dead or missing?  There's no

10  backstop?

11           THE WITNESS:  There is no indicator like that, sir,

12  no.

13           THE COURT:  I mean -- go ahead.

14           MR. DE VEGA:  Thank you, Your Honor.

15  BY MR. DE VEGA:

16  Q    But there is another department that takes care of this

17  after the fact; is that right?

18  A    Yes, sir.

19  Q    Okay.  If you could please explain to the jury how Refund

20  Anticipation Loans work.

21  A    Refund Anticipation Loans, otherwise known as RALs,

22  taxpayer goes to a preparer and submits the paperwork for this

23  RAL.  Basically, it's a loan that the preparer is giving to

24  the taxpayer.  They have to submit -- pay a fee for this, and

25  it's a loan.

Gillenwater – Direct

1       The preparer gives them a check right then and there for

2   the amount of the refund, minus the fee; and when the refund

3   comes in, the taxpayer must pay that to the preparer, to pay

4   off the loan.

5   Q    Are there any additional verifications performed by the

6   tax preparer to make sure that the tax returns are legitimate?

7   A    On RALs?

8   Q    Uh-huh.

9   A    No, sir, there is not.

10           MR. DE VEGA:  Thank you.  No further questions.

11           THE COURT:  Suppose somebody -- I mean, there's no --

12   the only question is does the Social Security match up with

13   the -- I mean, if they ask for $100,000, and they showed it

14   and they had the documentation with it, would they send them a

15   check for $100,000?

16           THE WITNESS:  If the name and Social Security number

17   match, it then goes to processing.  And processing, what

18   they're looking for are checking for math errors or documents

19   missing, like a Schedule A or Schedule C.

20           After that, there is no other validation done by

21   processing because they're not trained to do that, and we

22   don't want to hold up the refunds for good taxpayers.  So that

23   proc- -- the validation is done down the road by other

24   departments.

25           THE COURT:  But after the check has already gone out?

1       THE WITNESS:  Yes, sir.

2       MR. DE VEGA:  No further questions, Your Honor.

3       THE COURT:  Mr. Anderson?

4       MR. ANDERSON:  Thank you, Your Honor.  I don't have

5  any questions.  Thank you, sir.

6       THE COURT:  You may step down.

7       Call your next witness.

8       MR. MOTT:  Call Agent Gillenwater.

9       THE CLERK:  Raise your right hand, please.

10      CHRIS GILLENWATER, GOVERNMENT'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. MOTT:

13  Q    Please introduce -- well, you've been introduced.  Please

14  state your name for the jury, sir.

15  A    My name is Chris Gillenwater.

16  Q    And how are you employed, for the record?

17  A    I'm a special agent with the Internal Revenue Service,

18  Criminal Investigation.

19  Q    How long have you been with IRS Criminal Investigations?

20  A    Since July 2009.

21  Q    And tell the jury how you got involved in the case.

22  A    Basically, there was some financial reporting regarding

23  the defendant here, Muawia Abdeljalil, in which Treasury

24  checks were being deposited, with addresses from Florida, into

25  accounts up here.  And then we were invited -- received an

Gillenwater – Direct

1  invite letter from the United States Attorney's Office to open

2  up a grand jury investigation.

3  Q    And did you do that?

4  A    Yes, we did.

5  Q    What did you do as part of your investigation?

6  A    We issued subpoenas and analyzed bank records.

7  Q    From where?

8  A    From Bank of Botetourt, Bank of Floyd, Hometown Bank, a

9  lot of local banks.  And then some of those banks led us down

10 to Florida accounts, Bank of America accounts, SunTrust.

11 Q    In what way?  How did it lead you down to Florida?

12 A    Well, basically, when we got into analyzing Muawia

13 Abdeljalil's accounts, we saw a lot of checks going back to

14 his brother, Khaldoun Khawaja, who resides in Florida, has

15 convenience stores, who we talked about earlier today.  And

16 that's how we got initially down to Florida and looking at

17 those accounts.

18 Q    Okay.  And is it fair to say the majority of the checks

19 were for U.S. Treasury checks for IRS tax refunds?

20 A    Yes, it is.

21 Q    Were there also Refund Anticipation Loans or RALs as

22 they're known?

23 A    Yes, there were.

24 Q    And would you echo Mr. Mathers' testimony about what a

25 RAL is?

Gillenwater - Direct

1  A    Yeah.  What a RAL is -- Mr. Mott addressed earlier as

2  well -- is a loan on your anticipated refund.  So basically,

3  you pay a higher fee, it's about 10 percent, but you can get

4  your refund quicker, within 48 hours of the IRS accepting your

5  tax return.

6  Q    And in addition to analyzing the banking activity, what

7  did you do about the Treasury checks that were going into the

8  accounts?

9  A    We also looked at some of those and noticed that some

10 people were deceased, some were prisoners, and we analyzed

11 some of those returns.

12 Q    And did you look at the returns that were introduced as

13 Government's Exhibit 4 by Mr. Mathers?

14 A    Yes, we did.

15 Q    And why those returns?

16 A    Those were prisoners in Florida, as part of the

17 Department of Corrections down there, in closed custody, which

18 means a lot of them had life sentences, and there's no way

19 that they could negotiate the refund checks.

20 Q    And so of the Treasury -- well, go on past that a little

21 while.

22      Did you continue to gather Treasury refund checks?

23 A    Yes, we continued.

24 Q    And what did you do with them after you obtained them?

25 A    After we obtained them, I put them into a spreadsheet and

Gillenwater – Direct

1  just totaled them up from there.

2  Q   Do you recall off the top of your head, without looking

3  at your spreadsheet, ultimately how many checks were involved

4  in this case?

5  A   Approximately, 17.7 million.

6  Q   And how much in terms of quantity, number of checks?

7  A   Right over 4,000.

8  Q   And were they -- you mentioned prisoners.  What other

9  names were they in, names and identifying information?

10  A   Names of deceased individuals and prisoners.

11  Q   Okay.  And was there a web site at one point from which

12  you could obtain identifying information of deceased persons?

13  A   Yes, there was.  That web site has been since taken down.

14  It was called RootsWeb, which basically had the Social

15  Security death index, where you could just pull it up and get

16  their Social, name and date of birth.  And a lot of these

17  identities were taken from that web site.

18  Q   Now, does --

19       THE COURT:  I take it that means y'all didn't get

20  those numbers yourself?

21       THE WITNESS:  No.

22  BY MR. MOTT:

23  Q   In response to Judge Wilson's earlier question, does the

24  IRS compile information on deceased people to prevent that

25  type of thing, filing in dead people's names?

Gillenwater – Direct

1  A    It is my understanding that they do.

2  Q    Do you know how they do that?

3  A    Social Security and our main system, which is called

4  IDRS, talk to each other.  And it's my understanding that

5  they --

6  Q    But that's not done at the front end when the return is

7  filed?

8  A    Apparently not.

9  Q    Were there stolen checks as well involved in the case?

10 A    Yes, there were.

11 Q    Was there one in the name of a man named Craig Weiss, who

12 has been subpoenaed for this hearing?

13 A    Yes, there was.

14 Q    Let me go through some documents if I could with you,

15 Agent Gillenwater.

16        MR. MOTT:  And, Mr. Workman, if you could bring up

17 0911.

18 BY MR. MOTT:

19 Q    What is 0911, Agent Gillenwater?

20 A    It's a spreadsheet that I created, and these are the tax

21 returns that Mr. Mathers just introduced.  And the ones that

22 he introduced on here, if you'll look right here where it says

23 "refund check deposited into account of," those would be the

24 ones deposited into the defendant's account.

25 Q    And these particular ones were all prisoners?

Gillenwater – Direct

1   A     Yes, they were.

2   Q     And did you discuss –– now, the Florida Department of

3   Corrections maintains a web site with prisoner incarceration

4   information on it; is that correct?

5   A     That is correct.

6   Q     And did you review that information?

7   A     Yes, I did.

8   Q     Did you also speak to officials with the Florida

9   Department of Corrections to ascertain the confinement

10  conditions?

11  A     Yes, I did.

12  Q     As far as how much money a prisoner can make and ––

13  A     Yes.

14  Q     –– that sort of thing?

15  A     Yes.

16  Q     And besides –– why is it limited to these 11 returns?

17  A     These people we looked at on the web site, and these are

18  in closed custody, so these are under supervision, I believe

19  23 hours out of the day, under armed supervision; some of them

20  are serving life sentences, and they were incarcerated well

21  before the checks were negotiated and remain incarcerated.

22        MR. MOTT:  If I could see 0914, Mr. Workman.

23  BY MR. MOTT:

24  Q     Can you identify Number 0914?

25  A     Yes, I can.

Gillenwater – Direct

1  Q     What is it?

2  A     It's a spreadsheet also that I created, in which I go

3  into the actual information from the return, the wages, the

4  tax withheld.

5  Q     And up at the top there's an abbreviation IRP.  What does

6  that stand for?

7  A     Information return processing.

8  Q     And why is that appendix entitled "False Claim Supported

9  by IRP"?

10  A     Well, the IRP, the information return processing, is

11  going to have any information regarding if you have W-2 wages,

12  withholding, or any type of income.  Anything that's basically

13  put onto a form, it would show up there.  There is some lag

14  time frame to being input into the system.

15       But all those show zero right here, so none of that

16  matches up with the returns that were filed.

17  Q     So the IRP, as to each of these returns, shows zero

18  withholding?

19  A     Yeah.  Zero withholding, zero income.

20  Q     But the returns that were filed showed substantial

21  income --

22  A     Substantial.

23  Q     -- or substantial withholding?

24  A     I believe the average was around 50 percent.

25  Q     And you performed a percentage analysis of withholding

Gillenwater – Direct

1  versus income and wages?

2  A    Yes, I did.

3         MR. MOTT:  Okay.  The next slide, please.  It should

4  be 4823.

5  BY MR. MOTT:

6  Q    What is Number 4823, that's on the screen there?

7  A    This is an application for registration of a fictitious

8  name, which is basically a document that you submit when

9  opening a business, to register the name of that business in

10 Florida.

11 Q    And why did you obtain that document?

12 A    Because the defendant has a business called Short Stop.

13 Q    And what is Short Stop?

14 A    Short Stop was a convenience store, I believe in

15 Immokalee, Florida, which is I think about a hour south of

16 Tampa.

17 Q    And it was apparently organized sometime in 2006?

18 A    Yes, that's correct.

19 Q    And do you recognize any of the other information on that

20 application?

21 A    Just the address of the business.

22 Q    Did you receive bank records relating to this business --

23 A    Yes, I did.

24 Q    -- in the course of your investigation?

25         MR. MOTT:  Next slide, please.

Gillenwater – Direct

1  BY MR. MOTT:

2  Q    And the next slide is Number 4801, I believe.  Can you

3  identify what 4801 is?

4  A    Yes.  This is where the ownership of Short Stop is

5  changing from the defendant to Ihsan Innab.

6  Q    And it looks like it was changed sometime in January of

7  '09?

8  A    I believe so, but the filing date's in March.

9  Q    And it appears to change the name -- transfer the

10  fictitious name to Ihsan Innab?

11  A    Yes.

12          MR. MOTT:  And if you could go back on that screen.

13  BY MR. MOTT:

14  Q    And it was filed sometime, as you say, in March of 2009?

15  A    Yes, that's correct.

16          MR. MOTT:  Next slide, please.

17  BY MR. MOTT:

18  Q    The document in front of you is Number 00941?

19  A    Yes.

20  Q    What is it?

21  A    This is a analysis of a bank statement from Short Stop,

22  in which the deposits were listed from January '08 through

23  September of 2009.

24  Q    And does the deposit activity appear to decrease

25  significantly following January of 2009?

Gillenwater – Direct

1   A     Yes, it does.

2   Q     And then it appears to stop from May to September of

3   2009?

4   A     Yes, it does.

5   Q     Did that change sometime after that?

6   A     In October of 2009 is when the Treasury checks began to

7   be deposited into that account.

8          MR. MOTT:  Next slide, please.

9   BY MR. MOTT:

10  Q     And that document is numbered 86651?

11  A     Yes, that's correct.

12  Q     What is it?

13          THE COURT:  Mr. Mott, you're identifying these by

14  number.  Are these all part of the previously marked and

15  received exhibit, or what is it?  Are these your --

16          MR. MOTT:  I have an exhibit, and I'm identifying

17  them now, and I intend to offer a disc.

18          THE COURT:  But the number that you're giving is not

19  corresponding to a particular number, as of this time, as to

20  exhibit number?

21          MR. MOTT:  No, sir.  No, sir.

22  BY MR. MOTT:

23  Q     Continue to describe what we're seeing on the screen.

24  A     Yeah.  From the bank documents, I would input each time I

25  saw a Treasury check.  So I would put the last name, first

Gillenwater – Direct

1  name.  Just going from left to right, last name, first name,

2  street address, city, state, date that it was negotiated, and

3  the refund amount, and if it was a RAL versus an actual

4  Treasury check.

5  Q    The blued-out section, you've redacted the address on the

6  Treasury check?

7  A    Yes.  That was the street address.

8  Q    And redacted a portion of the bank account number?

9  A    That's correct.

10  Q    And that way, it could be sorted by any of the columns

11  going across the top?

12  A    That's true.

13  Q    And this particular one is sorted alphabetically by last

14  name?

15  A    Yes, it is.

16        MR. MOTT:  Next page, please.  If you could blow up

17  the top portion.

18  BY MR. MOTT:

19  Q    And you mentioned that the bank activity increased in

20  that account.  Did you start seeing deposits in October of

21  2009?

22  A    Yes, I did.

23  Q    And November of 2009?

24  A    Yes.

25        MR. MOTT:  Next page, please.  Sort of the middle of

Gillenwater – Direct

1  the page, if you could, Mr. Workman.

2  BY MR. MOTT:

3  Q    More deposits in November of 2009?

4  A    Yes, that's correct.

5  Q    How long did the Shortstop account go on?  How long was

6  it active?

7  A    I believe until June of 2010.

8        MR. MOTT:  Mr. Workman, if you could go to 86634, and

9  blow up the top portion, please, sir.  I beg your pardon.

10 Blow up the bottom of it.  That's correct.

11 BY MR. MOTT:

12 Q    What are we looking at, Agent Gillenwater?

13 A    I believe this is the -- this is the BNA Auto account --

14 Q    Okay.

15 A    -- at Bank of America.  This is the total amount

16 deposited in IRS refund checks; this is the RAL amount; and

17 then the last amount, the 6.4, is Treasury checks.

18 Q    So you did a similar process for the BNA account that you

19 did with the Short Stop account?

20 A    Yes, I did.

21 Q    And those are the totals for the Treasury checks and RALs

22 that were deposited into the BNA account at Bank of America?

23 A    Yes.  Approximately, 7.5 million.

24 Q    Was that account closed at some point?

25 A    Yes, it was.

Gillenwater - Direct

1    Q    Do you recall when?

2    A    I believe in November of 2010.

3              MR. MOTT:  And, Mr. Workman, if I could see the

4    bottom left part of 86634.

5    BY MR. MOTT:

6    Q    Is that the total number of checks that were deposited

7    into the BNA account, Bank of America?

8    A    Yes.  I can't see the -- I can see the total, but I can't

9    see the RAL checks and Treasury checks, but that looks like

10   it.

11             MR. MOTT:  Can I see the next page, 86635?

12   BY MR. MOTT:

13   Q    Now, after the Bank of America account was closed, did

14   Mr. Mustafa open an account at JPMorgan Chase Bank?

15   A    Yes, he did.

16   Q    With an account number ending in 6459456?

17   A    That's correct.

18   Q    And did you perform a similar process in terms of putting

19   all of the Treasury checks into that account into a

20   spreadsheet?

21   A    Yes, I did.

22   Q    And do you recall when the first deposit into that

23   account was?

24   A    I believe it was December of 2010.

25             MR. MOTT:  Mr. Workman, if we could have 86650.

Gillenwater – Direct

1  BY MR. MOTT:

2  Q    Do you recall what the total of the checks going into the

3  JPMorgan Chase account was?

4  A    I believe it was over $6 million.

5  Q    How much?

6  A    Over 6 million, I believe.

7  Q    Okay.

8        MR. MOTT:  Do you have 86658?

9  BY MR. MOTT:

10  Q    By the way, how did you tell where the checks were

11  deposited?  This may be a dumb question.

12  A    How the checks were deposited?

13  Q    How did you find out which bank account they went into?

14  A    Well, the two latter accounts were discovered by the U.S.

15  Marshal's Service down in Florida.

16  Q    How do you associate a check with a bank statement?  Do

17  you understand what I'm saying?

18        Can you follow a Treasury check by the endorsement on the

19  back?  Or how do you associate it with a specific account, out

20  of four different accounts, say?

21  A    Oh, I just went through -- I went through the bank

22  subpoenaed documents and just corresponded that and made the

23  spreadsheet out of the --

24  Q    Correspond the date on the check with the deposit?

25  A    Uh-huh.

Gillenwater – Direct

```
 1  Q    Okay.  Did you also examine an account at Wachovia ending

 2  in 1893?

 3  A    Yes, I did.

 4  Q    Via the same method as the other accounts you've

 5  testified to?

 6  A    Yes.

 7  Q    And what did you determine with reference to that account

 8  in terms of the number or the value of Treasury checks and

 9  RALs?

10  A    The total approximate amount is 23,000 that was deposited

11  into that account.

12  Q    And were they all negotiated on one day?

13  A    Yes, they were.

14  Q    How long was that account open?

15  A    Just a couple of days.

16  Q    And you examined other accounts associated with other

17  defendants as well?

18  A    Yes, I did.

19  Q    Mr. Khawaja?

20  A    That's correct.

21  Q    Mr. Abdeljalil?

22  A    That's correct.

23  Q    And went through the same process with all of those

24  accounts?

25  A    Yes.
```

Gillenwater – Direct

1            MR. MOTT:  Could we have 86610?

2   BY MR. MOTT:

3   Q    Agent Gillenwater, what is the document that we're

4   looking at now?

5   A    This is a summary of all the accounts I looked at, that

6   have the totals, the refund checks deposited.

7            MR. MOTT:  And can we blow that up as much as

8   possible?

9   BY MR. MOTT:

10  Q    And you denominated the bank, the name on the account,

11  and the amount deposited?

12  A    That's correct.

13  Q    As well as the number of checks deposited?

14  A    That's correct.

15  Q    And the date of the initial deposit and the last deposit

16  into the account?

17  A    That's correct.

18  Q    And who the account was controlled by?

19  A    That's correct.

20  Q    And what was the -- what were the totals of the RALs?

21           THE COURT:  Let me ask a question.  Excuse me,

22  Mr. Mott.  When you say controlled by, do you mean on the

23  signature card, or how are you --

24           THE WITNESS:  Yes, on the signature card.

25  BY MR. MOTT:

Gillenwater – Direct

1  Q    So when you were obtaining bank records, you also got the

2  signature cards that were used to open the account?

3  A    Yes, I did.

4  Q    Looked at the name on the account?

5  A    Yes.

6  Q    And what were the totals by each of the three defendants?

7  A    The totals for each of the defendants is down at the

8  bottom.  So Abdeljalil, who's also known as Mike,

9  approximately 1.8 million; Sam, approximately 15.8 million;

10 and then Khaldoun Khawaja, who's known as Tony, 112,000 went

11 into his account.

12 Q    So that would be over $17 million?

13 A    Yes.

14 Q    And the numbers to the right are the number of deposits

15 related to fraudulent returns?

16 A    That's correct.

17      THE COURT:  The $15,842,026.07 figure, represents

18 RALs as well as Internal Revenue Service refunds?

19      THE WITNESS:  Yes.  That's the total amount.

20 BY MR. MOTT:

21 Q    And is this the sum of all three?

22 A    That's correct.

23      THE COURT:  And it represents 3,661 transactions,

24 that is, RALs or refund checks?

25      THE WITNESS:  Yeah, the checks individually, so 3,661

Gillenwater – Direct

1   checks deposited into Sam's account.

2   BY MR. MOTT:

3   Q    And to clarify that a little bit, often these checks

4   would all be in one deposit?  So in terms of transactions --

5   A    Yes.  Yes.

6   Q    -- versus checks, sometimes there would be a bunch of

7   checks in one deposit transaction?

8   A    Yes.

9         THE COURT:  Let me ask this question:  Paragraph 12

10  of the indictment, the overt acts, Count One, listed 3,633

11  fraudulently obtained Internal Revenue Service and Refund

12  Anticipation Loan checks totaling $15,719,584, deposited under

13  Mr. Mustafa's control.  We are talking about, essentially,

14  that series of transactions?

15        THE WITNESS:  Yes, we are.

16        THE COURT:  And can you account for the difference

17  between -- I know there's a lot of money in it.  It's a small

18  difference, but between the 3,633 in paragraph 12, and the

19  15,719,584 versus the $15,842,026.07?

20        THE WITNESS:  Yes.  In the figure that you're looking

21  at, we had the reclamations taken back out of the deposit to

22  figure, because those had been covered.

23        THE COURT:  But it's essentially those transactions?

24        THE WITNESS:  Yes.  This is the total amount that was

25  deposited into the defendant's account.

Gillenwater – Direct

1              THE COURT:  All right.

2  BY MR. MOTT:

3  Q     And you had, as part of your analysis, segregated out

4  Treasury checks versus RALs as you went along?

5  A     Yes, I did.

6  Q     And is it fair to characterize that exhibit, Appendix --

7              MR. MOTT:  Can we see the big picture?

8  BY MR. MOTT:

9  Q     That Appendix A, is that sort of the -- all of the

10  previous appendices we've been looking at are aggregated into

11  Appendix A?  All the separate bank accounts are aggregated

12  into this?

13  A     That is correct.  That's the total amount.

14  Q     Now, in an effort to -- well, strike that.

15        As part of your investigation and preparation of this

16  case, did you attempt to identify checks that were for the --

17  for identical amounts?

18  A     Yes, I did.

19  Q     And why did you do that?

20  A     Just to show the commonality of the amounts going into

21  the account; that it's probably the same return, the numbers

22  on the return.

23              MR. MOTT:  If I could have 85881.

24  BY MR. MOTT:

25  Q     And what is 85881?

Gillenwater – Direct

1  A    These are the checks -- and this is sort of from the main

2  Appendix A that we just discussed.  But these are the checks

3  in the amount of 1453, deposited into the BNA Auto account at

4  Bank of America, and also the JPMorgan account.  And I believe

5  it's over 300 of the same amount that were deposited into the

6  accounts.

7  Q    And this exhibit is limited to the Mustafa accounts; is

8  that correct?

9  A    Yes, it is.  Yes, it is.

10 Q    So there would be identical dates on the checks for

11 identical amounts?

12 A    That is correct.

13 Q    And the depositor would deposit identical checks with

14 identical dates, on the same day?

15 A    That's correct.

16 Q    How many -- let me see.

17       MR. MOTT:  If I could have 85886.

18       THE COURT:  Mr. Mott, for purposes of the record --

19 for my purposes and purposes of the record, the exhibit

20 number -- you're giving the number that's in your computer

21 system the way he's identifying them.  That's not the number

22 that it's going to be received under, so how are you doing

23 that?

24       MR. MOTT:  Perhaps I can try to do that right now.

25       (Government's Exhibit Number 5 was marked for

Gillenwater – Direct

1  identification.)

2  BY MR. MOTT:

3  Q    Agent Gillenwater, let me show you what's being marked as

4  Government's Exhibit 5.

5       As part of your preparation for this case, did you review

6  your work and compile it into an exhibit folder?

7  A    Yes, I did.

8  Q    And was that exhibit folder burned onto a disc?

9  A    Yes, it was.

10 Q    And labeled with the Bates numbers that we've been

11 referring to?

12 A    Yes, it is.

13 Q    And are they -- well, it's your work product?

14 A    That's correct.

15 Q    And it's true and accurate to the best of your knowledge?

16 A    That's correct.

17       MR. MOTT:  Your Honor, I would move for the

18 introduction of Number 5, and I hope that answers it.

19       MR. ANDERSON:  Excuse me.  No objection.

20       THE COURT:  So all of these numbers that you've been

21 referring to in the 8,000-plus series have all been contained

22 within Government's Exhibit Number 5?

23       MR. MOTT:  Yes, sir.  Well, that may be for the

24 witness.

25       THE WITNESS:  That's correct.

Gillenwater – Direct

1          THE COURT:  All right.  Thank you.

2      (Government's Exhibit Number 5 was received.)

3          MR. MOTT:  Could we find 85886?  Oh, we're there now.

4  BY MR. MOTT:

5  Q    Did you examine one particular date, November 5th of

6  2010?

7  A    Yes, I did.

8  Q    And how many checks in the amount of 1,453 were

9  deposited?

10  A    There were 56 checks that were deposited that day with

11  the same amount.

12  Q    On one day?

13  A    On one day.

14  Q    Now, did some of the checks have the same name on them?

15  A    Yes, they did.

16  Q    And what do you mean by that?

17  A    They had the same last name.

18          MR. MOTT:  Could we have 85887?

19  BY MR. MOTT:

20  Q    Was one of those names in particular Nix, N-I-X?

21  A    That's correct.

22  Q    And what is the exhibit that we're looking at, Number

23  85887?

24  A    That's the -- I sorted it by last name, and those were

25  the names that were pulled up.

Gillenwater – Direct

1          If we could go back out, Rob.

2          And these were all deposited on 11/5 also, which is part

3   of that amount just mentioned, the 56 checks.

4          If we could get it a little bigger, perhaps.

5          So on 11/5, 32 individuals with the last name Nix, right

6   here, had checks deposited into the BNA Auto account.

7   Q    And am I reading that correctly, that they're all for

8   $1,453?

9   A    That's correct.

10  Q    And all in the same name?

11  A    That's correct.

12  Q    And all on the same date?

13  A    That's correct.

14          MR. MOTT:  Could we have 85877?

15  BY MR. MOTT:

16  Q    What's 85877?

17  A    This, I sorted the main appendix by address, and then

18  looked at the accounts that the checks went into.

19          So, for instance, on Number 1, 108 West Keys, Apartment

20  B, there were two checks sent to there in the overall

21  appendix.  One got deposited into a Sam account, and one got

22  deposited into an Abdeljalil account.

23          THE COURT:  Mr. Mott, I don't mean to keep following

24  up on this Exhibit Number 5 and these numbers that you are

25  referring to in the record each time, but is there a paper

Gillenwater – Direct

1  version of this as an exhibit so that the jury does not have

2  to take back to the jury room a --

3          MR. MOTT:  There is not, but we can make one.

4          THE COURT:  -- a disc?

5          MR. MOTT:  We were trying to go paperless.  We can

6  make --

7          THE COURT:  I mean, we're paperless here in the

8  courtroom, but being paperless back in the jury room is a

9  different matter.

10          MR. MOTT:  Yes, sir.  It may be we can print a copy.

11          If we could have 85880.

12  BY MR. MOTT:

13  Q    What is 85880, Agent Gillenwater?

14  A    It's a continuation of the previous slide that we looked

15  at.  This just gives the total amount, which is 39 separate

16  occasions, checks that were issued down in Florida, got

17  deposited either into an Abdeljalil account or a Sam account.

18  Q    And that's the last page of the previous document you

19  were talking about?

20  A    Yes, that's correct.

21  Q    And there were 39 identical addresses?

22  A    That's right.

23  Q    Did you examine a particular address of 911 Axlewood

24  Circle?

25  A    Yes, I did.

Gillenwater - Direct

```
 1            MR. MOTT:  If we could have 85888.

 2   BY MR. MOTT:

 3   Q    What is that document, sir?

 4   A    This shows refund checks deposited into JPMorgan Chase

 5   account, with the address of 911 Axlewood Circle.

 6   Q    Actually, it's blacked out in the exhibit, but those are

 7   all for 911 Axlewood Circle?

 8   A    That's correct.

 9   Q    And did you also attempt to ascertain where that was?

10   A    Yes, I did.

11            MR. MOTT:  And if we could have 85990.

12   BY MR. MOTT:

13   Q    Did you run it in MapQuest?

14   A    Yes, I did.

15   Q    How far was it from BNA Automotive?

16   A    It's approximately 19 miles from BNA Automotive.

17            MR. MOTT:  Could we have 992?

18   BY MR. MOTT:

19   Q    Does that depict a path you would have to take between

20   911 Axlewood Circle and BNA Automotive?

21   A    Yes, that's correct.

22   Q    Now, during the course of your investigation, did you

23   also get information from bank personnel that led you to

24   obtain records from FedEx?

25   A    Yes, I did.
```

Gillenwater – Direct

1  Q    And why was that?  Why did you know or how did you know

2  to subpoena FedEx?

3  A    There was a conversation with a bank employee with one of

4  Mike Abdeljalil's sons, referring that -- she was trying to

5  figure out the cash needs of the business, and he told her

6  that they didn't need cash until the following week, because

7  that's when they received the envelopes from his uncle down in

8  Florida.

9  Q    And so did you receive those records?

10  A    Yes, I did.

11  Q    And what did you do with them?

12  A    Put them into a spreadsheet.

13        MR. MOTT:  And if we could see 00939.

14  BY MR. MOTT:

15  Q    What were you able to determine with reference to the

16  FedEx records?

17  A    Basically, the time frame the FedEx packages are going to

18  and from, up here and down there, the refund checks are being

19  deposited into Mike's -- Mike Abdeljalil's account up here.

20  Q    The print may be small, but do you recall the beginning

21  and end dates of the FedEx shipments?

22  A    Looks like the beginning date was February 19th, and then

23  continuing until July 10th, 2010.  Actually, there might be

24  another page that goes into a couple more dates.

25        THE COURT:  What were those dates again?

Gillenwater – Direct

```
 1              THE WITNESS:  February 19th, at the top.

 2              THE COURT:  February 19th of what year?

 3              THE WITNESS:  2010.

 4              THE COURT:  To which date?

 5              THE WITNESS:  In July -- there we go.  July 28th,

 6   2010.

 7              THE COURT:  Thank you.

 8   BY MR. MOTT:

 9   Q    Now, was there a takedown in May of 2012?

10   A    There was.

11   Q    And did you participate in that?

12   A    Yes, I did.

13   Q    And did you go to BNA Automotive, Inc., at 106 East

14   Linebaugh Avenue?

15   A    Yes, I did.

16   Q    Were records located at BNA Automotive related to money

17   laundering detection?

18   A    Yes, there were.  There was a brochure.  A brochure.

19   Q    And what was there?

20   A    Anti-money laundering brochure.

21   Q    And is identification important in anti-money laundering

22   efforts?

23   A    Yes, it is.

24              THE COURT:  What do you mean?  A brochure where?

25   BY MR. MOTT:
```

Gillenwater – Direct

1   Q    Describe what you found at BNA Automotive when you

2   participated in the consent search.

3   A    It was a brochure at the business that related to money

4   service businesses, what to look out for regarding --

5            THE COURT:  I mean, was it posted or was it in a

6   drawer or was it in a closet?  I mean, what are we talking

7   about?

8            THE WITNESS:  I believe it was behind the counter.

9   BY MR. MOTT:

10  Q    And in terms of the earlier question, what role does

11  identification play in anti-money laundering detection?

12  A    A big role, to identify who you're doing -- conducting

13  business with.

14  Q    And did you find any, like, identification logs or copies

15  of driver's licenses or anything like that at BNA Automotive?

16  A    I did not, but I believe there was two driver's license

17  information that they found; but other than that, I'm not

18  aware of anything.

19  Q    And in terms of the checks that you analyzed, were there

20  any thumb prints on them, or, you know, identifying

21  information on the Treasury checks that you examined?

22  A    Very minimal that actually had any identification on the

23  back.  I would say less than probably 40 or 30.

24  Q    Now, I've used a chart in my opening presentation.

25            MR. MOTT:  If you could pull that up, Mr. Workman.

Gillenwater – Direct

1   BY MR. MOTT:

2   Q    Did you incorporate the results of your investigation

3   into this summary chart?

4   A    Yes, I did.

5   Q    And if you would, describe what you placed on the summary

6   chart.

7   A    Okay.  Basically, we listed the defendants, marked in

8   blue.  So starting at the top was Sam.  He has these

9   businesses in Florida, BNA Automotive, Inc., Short Stop.  And

10  these are the accounts that I traced the Treasury checks going

11  into.

12       If we can back out of that.

13       Then with Tony, who owns several businesses also down in

14  Florida, we listed accounts that payments were being received

15  from Roanoke, as well as checks being deposited from Sam and

16  also Mike Abdeljalil.  And also we looked at his SunTrust

17  account, which had Treasury checks deposited in it as well.

18  Q    And just to avoid confusion, if we could go back.

19  Sometimes Khawaja is spelled K-A-W-A-J-A, and other times

20  K-H-A-W-A-J-A.  Is there any significance to that?

21  A    Well, the significance -- Tony, his businesses are Kawaja

22  Stores, leaving the H off, so all the accounts that he's got

23  with that has the H off.  Up here in Roanoke, with Mike

24  Abdeljalil, has the H in the name Khawaja.

25  Q    Okay.  Go ahead and continue with your explanation,

Gillenwater – Direct

1  please.

2  A    So like I said, we traced the checks into the accounts.

3  Well, actually -- so, okay.  The checks, which match up with

4  the spreadsheet that we talked about earlier, were coming into

5  the account.  And we also listed reclamations right here,

6  which Mr. Mott touched on earlier.

7  Q    That was in opening.  So please describe what a

8  reclamation is.

9  A    It's a recovery process used by the Department of

10  Treasury.  So if a check comes back as a forged endorsement,

11  then the Treasury Department will go after the bank for the

12  proceeds.

13  Q    And then what does the bank do?

14  A    The bank has 31 days to respond.  If they don't respond,

15  Treasury will debit their Federal Reserve master account, and

16  then they have to go back to the client to get the money.

17  Q    And I assume the client would go back against whoever

18  gave him or her the check.

19  A    Yes.

20  Q    It runs back up the line of negotiation?

21  A    Yes, that's correct.

22  Q    And that 15 million figure, is that -- you've got it on

23  an arrow going towards Mr. Mustafa.  Is that only his

24  accounts?

25  A    That's only his accounts.

Gillenwater – Direct

1  Q    And you did that same thing for the different defendants?

2  A    Yes, I did.

3  Q    And you noted the reclamations that came back against

4  each of the accounts?

5  A    Yes, we did.

6  Q    And this line, the $50,000 in checks from Khawaja to

7  Mustafa, did you find checks written from Khawaja to Mustafa?

8  A    Yes, we did.

9  Q    But you can't tie those to proceeds.  Those could be

10  anything?

11  A    Yes, they could be.

12          MR. MOTT:  If we could go down to Mr. Khawaja.  Let's

13  talk about the lower half, if we could.  Maybe capture a

14  little more up.

15  BY MR. MOTT:

16  Q    What have you depicted in the middle of the chart?

17  A    The middle of the chart -- which if we could go up a

18  little more, Rob -- shows 1.8 million corresponding back to

19  Appendix A, that we talked about earlier, going into

20  Abdeljalil's accounts, into these -- into these actual banking

21  accounts.  Sorry.  These accounts right here.  And then

22  reclamations going back as well in his account.

23  Q    And what about the lower part of that exhibit?

24  A    These, the 794,877 are checks written out of the accounts

25  over here, Mike Abdeljalil's accounts, 117 checks for 794,877,

Gillenwater – Direct

1  and then also funds transfer of 16,000 from Mike Abdeljalil's

2  accounts to Tony.  These checks, the 794, are going back to

3  Tony as well.

4       And then cash deposits, down here at the bottom, of

5  898,674, made in Roanoke, to Tony Khawaja accounts in Florida.

6            THE COURT:  I've got a question, Mr. Mott.  I see at

7  the top of that chart you're showing 442 IRS refund checks

8  deposited 2/8/2010 through 8/4/2010.

9            I note that in Count One of the indictment, paragraph

10  8 alleges 442 fraudulent IRS refund checks totaling

11  $1,820,195.  But unless I don't understand it, or unless I

12  misunderstand here, there is a date of 10/30/09 through 8/4/10

13  alleged in the indictment.  Are we talking about the same --

14            THE WITNESS:  We are.

15            THE COURT:  Obviously, the amount is the same.

16            THE WITNESS:  Yeah.  The date is wrong on this.

17  There was a couple of checks in October 2009, but the main

18  activity started in February.

19            THE COURT:  So to answer the question, essentially

20  the same, but there are only a couple of them that began in

21  February?

22            THE WITNESS:  Yeah.  Listed right here on the chart,

23  it talks -- except for two deposits in 10/30/2009.

24  BY MR. MOTT:

25  Q    Is that why you put it in parens, because it was only

Gillenwater – Direct

1  those two?

2  A    Yeah, it was only those two.

3  Q    So is it fair to say the checks were coming into the

4  accounts for 1.8, and then it was going back out as both

5  checks and deposits to Khawaja accounts?

6  A    That's correct.

7  Q    Tony Khawaja accounts?

8  A    Yeah, that's correct.

9        MR. MOTT:  If we could see the full picture again.

10  Down at the bottom.

11  BY MR. MOTT:

12  Q    You may have already described this, but you visualized

13  the FedEx records that you examined?

14  A    Yes, I did.

15  Q    And are those the correct dates for the transmission of

16  the FedEx packages?

17  A    Yes, I believe so.

18        MR. MOTT:  The full picture again, if you could.

19        THE COURT:  Mr. Mott, how much longer do you expect

20  this direct examination to take?

21        MR. MOTT:  15 minutes.

22        THE COURT:  Ladies and gentlemen, you know, I don't

23  want to keep y'all here too late tonight, but I do want to

24  make some progress.  Would you like a brief recess at this

25  time or would you prefer to wait?  I'll listen to you-all.

Gillenwater – Direct

1  Pardon?

2          THE JURY:  Carry on.

3          THE COURT:  Thank you.

4  BY MR. MOTT:

5  Q    Now, you have Mr. Khawaja and Mr. Abdeljalil at the

6  bottom of the chart, but they are brothers; is that correct?

7  A    Yes, that's correct.

8  Q    So the chart is genealogically correct in terms of level?

9  A    I would say that's correct.

10          MR. MOTT:  Your Honor, I would move for the

11  introduction of Government's -- I'll have it marked as

12  Government's Exhibit 1 and move for the introduction.

13          THE COURT:  Do you have it in a smaller fashion?

14          Yes, Mr. Anderson?

15          MR. MOTT:  I do.

16          MR. ANDERSON:  I have no objection.

17          THE COURT:  It will be received as Government's

18  Exhibit Number --

19          MR. MOTT:  1.

20          THE COURT:  1?  It will be received.

21      (Government's Exhibit Number 1 was marked and received.)

22  BY MR. MOTT:

23  Q    Agent Gillenwater, you also -- you and other agents

24  prepared a phone chart of the case?

25  A    Yes, we did.

Gillenwater – Direct

1    Q    And how did you go about doing that?

2    A    I believe that the FBI analyzed phone records.

3          MR. MOTT:  And at this point, Your Honor, I just move

4    for the -- to mark it as Government's Exhibit 2.

5          (Government's Exhibit Number 2 was marked for

6    identification.)

7          THE COURT:  All right.  Let me instruct the jury on

8    the matter.  These charts and summaries that are being

9    admitted are admitted from time to time in evidence, ladies

10   and gentlemen, are only as good as the underlying supporting

11   material.  You should, therefore, give them only such weight

12   as you think the underlying material deserves.

13   BY MR. MOTT:

14   Q    In terms of the underlying material, were cell phones

15   seized as part of the investigation?

16   A    Yes, they were.

17   Q    And were the contacts lists extracted from the

18   telephones?

19   A    Yes, they were.

20   Q    And was the contact information put into the chart?

21   A    Yes, some of the contacts were.

22   Q    And then the FBI, specifically Ms. Warner, obtained

23   telephone data and entered in the number of contacts into the

24   chart information?

25   A    Yes, she did.

Gillenwater – Cross

 1          MR. MOTT:  And this is just for identification at

 2   this point, Your Honor.

 3   BY MR. MOTT:

 4   Q     Were you familiar with the investigation in Florida?

 5   A     Yes, I was.

 6   Q     And you had a discussion at some point, and your case was

 7   further ahead, so the case came here?

 8   A     Yes, it was.

 9   Q     Did you take trips to Florida?

10   A     Yes, I did.

11   Q     Look at DMV photos?

12   A     Yes.

13   Q     Have you been able to identify any of the people in the

14   telephone chart?

15   A     Yes.

16   Q     And who have you been able to identify?

17   A     Danielle, which is at the center, right here, used to

18   work for Tony Khawaja, and I believe used to date Sam's son,

19   Mike, which is at the very center of the chart.

20          China Raphael, which is right below Mahmaud Mustafa,

21   right here, was a business partner with Khaldoun Khawaja,

22   Tony.  And Shirell Bloker also used to work with Tony.

23   Q     And how about Rashia Wilson in the bottom right-hand

24   corner?

25   A     Rashia Wilson is also a name that showed up in Sam's

Gillenwater – Cross

1   contact list.

2        MR. MOTT:  Thank you.  I believe that's all the

3   questions I have, Agent Gillenwater.  Please answer for the

4   defense, or any further questions the Court may have.

5        THE COURT:  Mr. Anderson?

6                    CROSS-EXAMINATION

7   BY MR. ANDERSON:

8   Q    Good afternoon, Special Agent Gillenwater.

9   A    Good afternoon.

10  Q    You became involved with this investigation originally

11  reviewing bank records from Mike Abdeljalil?

12  A    That's correct.

13  Q    You received some reports from banks, known as suspicious

14  activity reports, relative to Mr. Abdeljalil?

15  A    That's correct.

16  Q    And then once you began to examine the several banks that

17  we've seen on the charts relative to Mr. Abdeljalil, there was

18  a check drawn on the account that was controlled by Mr. Sam

19  Mustafa?

20  A    That's correct.

21  Q    Was that a Short Stop account or a BNA check, if you

22  recall?

23  A    I believe it was a Short Stop account.

24  Q    That's my recollection, too, but I just wanted to be

25  sure.

Gillenwater – Cross

1       And once you –– but before getting to that point in the

2   investigation, you also had a chance to examine the bank

3   records of Mr. Tony Khaldoun Khawaja?

4   A    That's correct.

5   Q    And I think that was the SunTrust Bank in the Tampa area.

6   A    Yes.  There was a number of them.

7   Q    When you examined that account, you were able to

8   determine that –– I believe it was 12 Treasury checks were

9   deposited into Mr. Tony Khaldoun Khawaja's account?

10  A    That's correct.

11  Q    And the total of those 12 checks, do you recall?

12  A    I believe 112,000, approximately.

13  Q    112,000.  That's what I recall.

14      And after the last –– were you able to determine when the

15  last deposit to Mr. Tony Khaldoun Khawaja's SunTrust account

16  was?

17  A    I have it in the spreadsheet.  I don't recall.

18  Q    Does July the 30th of '09 sound about right?

19  A    That sounds about right.

20  Q    And then after that –– strike that.

21      I think that might have been –– the July date might have

22  been the first deposit, and his last deposit was October 16 of

23  '09 in the SunTrust account.  Does that sound better?

24  A    Yeah.  Yeah.

25  Q    Looking at a time sheet.

Gillenwater – Cross

1       After those deposits, did you learn of the investigation

2  that was taking place in the Tampa, Florida, area relative to

3  Mr. Tony Khaldoun Khawaja?

4  A    Yes, I did.

5  Q    And did you learn from that investigation they had him

6  under surveillance?

7  A    I found out later.

8  Q    And did he run a business there basically called Main

9  Street Grocery?

10  A    Yes, he did.

11  Q    Was that a convenience store in one of the neighborhoods

12  there in Tampa?

13  A    Yes, it was.

14  Q    And did people show up at that convenience store and

15  essentially negotiate or sell their Treasury checks to

16  Mr. Tony Khaldoun Khawaja?

17  A    I've heard those accounts.

18  Q    And did you learn in the investigation that the line was

19  sometimes all the way out the door and down the street?

20  A    I have heard that, yes.

21  Q    Were you able to determine in your investigation if those

22  Treasury checks that were being negotiated there at Main

23  Street Grocery were portions of these checks you've referenced

24  in Government's Exhibit 1, I believe?

25  A    Yes.  I believe the time frame with the funds going back

Gillenwater – Cross

1    would be to correspond with those checks.

2    Q    Did your investigation reveal the original checks written

3    to Mr. Tony Khaldoun Khawaja's account?

4    A    Can you repeat the question?

5    Q    Yeah.  The investigation with these Treasury checks that

6    were being sold and negotiated at the Main Street Grocery,

7    they ended up in Tony Khaldoun Khawaja's account?

8    A    The 112,000.

9    Q    SunTrust, 112,000?

10   A    Yes.

11   Q    And then after that, your investigation led you to the

12   Short Stop account?

13   A    That's correct.

14   Q    And then to the accounts in Roanoke, Virginia, with

15   Mr. Mike Abdeljalil?

16   A    That's correct.

17   Q    Tony's brother?

18   A    Yes.

19   Q    Did you also conduct an analysis from the Short Stop

20   account as to the money that was written from Mr. Mustafa's

21   Short Stop account back to Tony Khaldoun Khawaja?

22   A    Yes, I did.

23        MR. ANDERSON:  Your Honor, may I have Madame Clerk

24   mark this for identification as Defense Exhibit 1?

25        (Defendant's Exhibit Number 1 was marked for

Gillenwater - Cross

1    identification.)

2           MR. ANDERSON:  If I may ask that the court security

3    officer hand that to the witness, please.

4    BY MR. ANDERSON:

5    Q    Special Agent Gillenwater, I'm showing you what's marked

6    for identification as Defendant's Exhibit 1.  I'll ask you to

7    look at that and then ask if you can identify that document.

8    A    Yes, I can identify it.

9    Q    And could you tell the ladies and gentlemen of the jury

10   what that document is?

11   A    This document shows checks going from Sam Mustafa's

12   account, BNA -- or Short Stop, back to Khaldoun Tony Khawaja,

13   either to his businesses or him personally.

14   Q    And does that Defendant's Exhibit 1 for identification

15   consist of six pages?

16   A    Yes, it does.

17          MR. ANDERSON:  Your Honor, I would move the admission

18   of Defendant's Exhibit 1.

19          THE COURT:  It will be received.

20       (Defendant's Exhibit Number 1 was received.)

21   BY MR. ANDERSON:

22   Q    Can you relate to the ladies and gentlemen of the jury

23   what the total amount paid back from the Short Stop account to

24   Mr. Tony Khaldoun Khawaja, the total amount?

25   A    $1,122,373.

Gillenwater - Cross

1   Q      So it's fair to say that Mr. Tony Khaldoun Khawaja got

2   about a million two back from Mr. Mustafa's Short Stop

3   account, in addition to the 112,000 he had in his own account?

4   A      That's correct.

5   Q      In the course of your investigation of the Short Stop

6   account, were you able to determine the total amount of

7   Treasury checks deposited into the Short Stop account?

8   A      Yes, I was.

9   Q      Do you recall what that amount was?

10  A      I believe approximately 1.8, 1.9 million.

11  Q      I'm looking at a chart that says 1.9.  May I show that to

12  you?

13  A      Yes.

14  Q      May I ask you just to look at that and see if that

15  refreshes your memory, top left corner.

16  A      Yeah, I believe that's correct.  This is not a

17  spreadsheet that I completed.

18  Q      Okay.

19  A      But I believe that's the approximate figure.

20  Q      Approximately.  For purposes of today, is it fair to say

21  to the jury that approximately 1.9 million was deposited into

22  the Shortstop account?

23  A      That's correct.

24  Q      When I say "deposited," I mean Treasury checks that the

25  government believes to be fraudulent.

Gillenwater – Cross

1   A     That's correct.

2   Q     And 1.8 million was written back in checks to Mr. Tony

3   Khaldoun Khawaja?

4   A     1.1, I believe.

5   Q     1.1?  1.2?

6         Were you able, during the course of your investigation,

7   to determine when the Shortstop account at the Bank of America

8   belonging to Mr. Mustafa was closed?

9   A     I believe it was in June of 2010.

10  Q     Do you remember when the last check drawn on the

11  Shortstop account to Mr. Tony Khaldoun Khawaja was written?

12  A     The last check that was written to Tony?  June of 2010.

13  Q     June 3rd of 2010?

14  A     Yes.

15  Q     And that Shortstop account, was that the Bank of America?

16  A     That's correct.

17  Q     Do you know from the results of your investigation

18  whether Mr. Mustafa applied for a registration to have a money

19  service business account at the Bank of America?

20  A     Yes, he did.

21  Q     Do you know what date that application would have been

22  made?

23  A     I do not.

24  Q     Were you able to, during the course of your

25  investigation, determine whether any of the checks written on

the Billy Nelson or BNA account at Bank of America were written to Mr. Tony Khaldoun Khawaja?

A I do not recall seeing it.

Q Did you learn during the course of your investigation that there came a time when Mr. Mustafa and Mr. Tony Khaldoun Khawaja separated ways, parted ways?

A Yes.

Q Did you do an analysis of the BNA bank account at Bank of America and the JPMorgan Chase account?

A I did an analysis of the deposits coming in. I did not pay attention specifically to create spreadsheets or anything, to the withdrawals or any amounts going out.

Q Were you able to determine when the last deposit with the Treasury check refund occurred in any account that Mr. Mustafa controlled?

A Yes. It was in April 2011.

Q April 2011?

A Yes.

Q Were you present in Florida, in the Tampa area, when Mr. Tony Khaldoun Khawaja was arrested?

A No, I was not.

Q Were you present when they did a search at his place of business?

A Of Tony's?

Q Yes, sir.

Gillenwater - Cross

1   A     No, sir.

2   Q     You were asked on direct about -- I think the word was

3   used, "takedown" of Mr. -- well, strike that.

4         Did you learn during the course of your investigation

5   that in May of 2011 there was a search warrant executed at the

6   Main Street Grocery, for where Tony Khaldoun Khawaja had his

7   business?

8   A     Yes.

9   Q     And did you learn also that after that search was

10  executed, sometime after that, Mr. Tony Khaldoun was arrested

11  for being a felon in possession of a firearm?

12  A     Yes, I did.

13  Q     During the course of your investigation, did you have an

14  opportunity to review an account at the Wachovia, Wells Fargo

15  Bank, listed in the name of BNA Automotive?

16  A     Yes, I did.

17  Q     Do I understand correctly that that account had

18  approximately 12 Treasury checks submitted for deposit to that

19  account?

20  A     Yes.

21  Q     And that account -- is it correct that that account was

22  closed within a couple days of its opening?

23  A     Yes, within a couple days.

24  Q     Did your investigation reveal, as to those 12 Treasury

25  checks in the Wachovia account, whether or not there was any

Gillenwater – Redirect

1   disbursements from that account?

2   A    I don't believe there were.

3   Q    I'm showing you what is Government's Exhibit 1 --

4   A    Yes.

5   Q    -- which is the chart.  Does it contain the number of

6   Treasury checks that were received by Mike Abdeljalil from his

7   brother, Tony Khaldoun Khawaja?

8   A    It shows that he deposited 1.8 million, 442 Treasury

9   checks.

10  Q    Is that the total value of the Treasury checks or the

11  number of checks?

12  A    It's the total value of the checks, 1.8 million,

13  approximately.

14  Q    And does this chart contain the number of checks that

15  represents?

16  A    442.

17  Q    442?

18  A    Yes, that's correct.

19  Q    And they were -- as far as your investigation reveals,

20  does it appear they were transferred via Federal Express

21  and/or the United States Mail?

22  A    Yes.

23  Q    And lastly, does the Government Exhibit Number 1 show the

24  amount of money that was returned from Mike Abdeljalil to his

25  brother, Tony Khaldoun?

Gillenwater – Redirect

1   A    Yes, it does, from what we traced.

2   Q    And what was the amount that your trace revealed that

3   amount was?

4   A    Rob, could you bring that back up?

5        It shows 794,000 in checks going back from Mike to -- to

6   Tony, and then 898,000 in cash deposits up here in Roanoke,

7   going back to Khaldoun Khawaja's accounts down in Florida.

8   Q    Approximately, a million and a half between the two?

9   A    Yeah.  A little more than that.

10       MR. ANDERSON:  One moment, please, Your Honor.

11       (Pause in the proceedings.)

12       MR. ANDERSON:  Thanks, Special Agent.  That's all the

13   questions I have.

14       THE COURT:  Redirect?

15       MR. MOTT:  Yes, sir.

16                    REDIRECT EXAMINATION

17   BY MR. MOTT:

18   Q    Agent Gillenwater, you didn't participate in the search

19   warrant at Main Street Grocery in Tampa, did you?

20   A    No, I did not.

21   Q    Was that in May of 2011?

22   A    I believe it was.  I believe it was.

23   Q    Do you know if any substantial assets were located, owned

24   by Mr. Khawaja?

25   A    No substantial assets except for a vehicle and some money

Gillenwater – Redirect

1  seized.

2  Q    And what magnitude are you speaking of when you say "some

3  money"?

4  A    I believe under 10,000.

5  Q    Let me ask you this way:  Mr. Anderson asked you about a

6  money service businesses application that Mr. Mustafa had

7  pending with Bank of America.

8  A    Yes.

9  Q    Were you familiar with that?

10 A    Yes, somewhat.

11 Q    And can you remember the date?

12 A    I can't remember the date.

13 Q    Do you know if there is a series of -- well, following

14 that application, did Mr. Mustafa receive closure letters for

15 the account?

16 A    Yes, he did.

17 Q    And did he seek extensions of the closure letters?

18 A    Yes, he did.

19 Q    Did that happen on more than one occasion?

20 A    Yes, I believe so.

21 Q    When was that account finally closed?

22 A    Which account were you --

23 Q    The BNA Automotive account for which the MSB application

24 was pending.

25 A    November 18th, I believe, of 2011 -- or 2010.

Gillenwater – Redirect

1  Q    And by that time, several million dollars in Treasury

2  checks had gone through the account?

3  A    Yes.

4         MR. MOTT:  Thank you.  I think that's all I have.

5         THE COURT:  You may step down.

6         Is the jury worn out yet?

7         How long do you expect your next witness to take?

8         MR. MOTT:  Well, the next two are fairly lengthy

9  witnesses.

10         THE COURT:  Let me ask you, would this be an

11  appropriate time to adjourn for the evening?

12         MR. MOTT:  I think it would.  If there was a short

13  witness, I would put him or her on, but the next ones are all

14  fairly lengthy.

15         THE COURT:  All right.  Ladies and gentlemen, maybe

16  this would be a good time to adjourn for the evening.  We'll

17  pick back up here tomorrow morning at 9:00 a.m.  Please

18  remember all the instructions I've given you about this case.

19  And look forward to seeing you all back here tomorrow morning

20  at 9:00 a.m.  And we'll stand in adjournment.

21         If I could see counsel briefly.

22       (Court adjourned at 5:36 p.m.)

23

24                     CERTIFICATE

25  I,  Judy K. Webb, certify that the foregoing is a correct

1   transcript from the record of proceedings in the

2   above-entitled matter.

3

4   /s/  Judy K. Webb                Date:  7/30/2013